873 So.2d 1116 (2003)
Ex parte SOUTHERN ENERGY HOMES, INC.
(In re Southern Energy Homes, Inc. v. Emma Riddle).
1020037.
Supreme Court of Alabama.
June 27, 2003.
*1117 Warren B. Lightfoot, Jr., of Maynard, Cooper & Gale, P.C., Birmingham (reply brief filed by Warren B. Lightfoot and John B. Holmes III of Maynard, Cooper & Gale, P.C., Birmingham; W. Scott Simpson of Batchelor & Simpson, P.C., Birmingham; and Christopher A. Mixon, Birmingham), for petitioner.
Richard E. Fikes of Tweedy, Jackson, Beech & Fikes, Jasper, for respondent.
MOORE, Chief Justice.
Southern Energy Homes, Inc., petitions this Court for a writ of certiorari to challenge the Court of Civil Appeals' affirmance of the trial court's finding that Emma Riddle is 100% permanently and totally disabled and therefore entitled to workers' compensation benefits. We granted the petition to determine whether Riddle presented substantial evidence of a permanent total disability as defined by the Workers' Compensation Act. We reverse and remand.

I. Facts
Southern Energy builds and distributes manufactured homes. It hired Emma Riddle in November 1995 at Southern Energy's Lynn plant to clean the manufactured homes before they left the manufacturing facility. Emma was 53 years old at the time of trial. Before she was hired by Southern Energy, Riddle had worked for approximately 20 years at various jobs, such as driving a school bus, raising chickens, and working as a security guard for different companies. Riddle alleged in her complaint that she first injured her back in April 1996 when she fell off a six-foot ladder and landed on her feet. As a result of her fall, she missed one day of work, after which she was back to work performing all of her normal duties. She testified that she continued to feel significant pain in her lower back after that incident, despite the fact that she continued to work. Riddle testified that she immediately informed her supervisor that she had been injured on the job and that five days after the incident she asked to see a doctor. However, Riddle never filled out the workers' compensation paperwork for an on-the-job injury, and when she asked to see a doctor an administrative employee informed Riddle that Southern Energy was not aware that she had been injured on the job.
*1118 In early 1997, because Southern Energy was downsizing its workforce, Riddle was transferred from the Lynn plant to Southern Energy's Double Springs plant. Riddle's supervisor first assigned her to clean black marks off walls and counters of the manufactured homes, but when Riddle complained that she was tired and that the fumes of the cleaning solution bothered her, the supervisor switched her to stripping protective plastic off the floors. When Riddle complained that that job also bothered her, the supervisor switched her to smaller clean-up work that included vacuuming the insides of the manufactured homes.
On or around January 5, 1997, the same day she was assigned to do the vacuuming work, Riddle complained to her supervisor that she hurt her back when she was pushing a vacuum cleaner inside one of the manufactured homes. Riddle did not testify that she had suffered a specific trauma to her back on that day, only that her "back started paining even more" when she was "trying to push a vacuum cleaner." Riddle and Southern Energy filled out the paperwork necessary for a workers' compensation claim, and Riddle never returned to work at Southern Energy. In fact, Riddle has not worked anywhere since January 5, 1997; she has not attempted to work anywhere; and she has not applied for new work.
During Riddle's employment with Southern Energy, her primary-care physician was Dr. Bernard Simieritsch. Riddle testified that she informed Dr. Simieritsch of her daily back pain, but Dr. Simieritsch's records admitted into evidence do not mention the April 1996 incident or any complaints of back pain during Riddle's first seven visits to Dr. Simieritsch after the alleged April 1996 incident. On a January 24, 1997, visit to Dr. Simieritsch, after she had filed a workers' compensation claim with Southern Energy and had stopped working for Southern Energy, Riddle informed Dr. Simieritsch that she had fallen off a ladder in April 1996 and that she has had problems with her back since that time. She also indicated that she had hurt her arm in the fall. After an X ray and CT scan of Riddle's spine, Dr. Simieritsch diagnosed Riddle with degenerative disk disease of the lumbar spine, but testing did not indicate neurological impairment or a herniated disk.
Dr. Simieritsch referred Riddle to Dr. Edward Fisher, an orthopedic surgeon. Dr. Fisher treated Riddle on five occasions beginning on February 5, 1997, and ending on June 4, 1998. Initially, in February 1997, Dr. Fisher stated in his records admitted into evidence that "[i]t is certainly possible that [Riddle's] problems are a result of the injury she described," but that "there is no objective way to completely decide one way or the other." By May 14, 1998, Dr. Fisher observed that Riddle's "complaints of symptoms seem[] out of proportion to any physical findings." Dr. Fisher concluded that, pending an MRI, "[Riddle] would be able to work with restrictions of no heavy lifting, repetitive bending or stooping."
However, on May 21, 1998, after an MRI had been performed, Dr. Fisher concluded that Riddle had "mild degenerative disk changes with no evidence for nerve impingement, nothing unexpected for someone her age." He diagnosed her with "[d]egenerative disk disease of the lumbar spine with back pain" and "[d]egenerative arthritis of her right elbow with pain." By June 1998, Dr. Fisher concluded that "[a]lthough she has quite a few symptoms[,] there are not really any objective findings to rate any permanent impairment." He did not place any work restrictions on Riddle upon releasing her from his care.
*1119 Southern Energy paid for some of the care provided by Dr. Simieritsch and Dr. Fisher, but Riddle decided to seek further treatment from other doctors of her own choosing. She sought treatment from Dr. Forqouk Raquib, who initially diagnosed Riddle with degenerative changes in her lower back but concluded that she did not have any "surgical disease," based on his review of the CT scan and MRI. On the basis of his interview with her, Dr. Raquib initially concluded that Riddle's "long term prognosis is poor as far as ... returning to any meaningful job," and he did not believe she would be able to hold a sedentary job, "as she's in constant pain and unable to sit or stand for more than 5-10 minutes at a time."
As part of Riddle's treatment, Dr. Raquib referred Riddle to a physical therapist, David Breedlove. After 11 sessions with Riddle between September and October 1998, Breedlove discontinued the therapy because, he said, Riddle was "not progressing and [she] demonstrates an inconsistency in that she has very minimal forward flexion from a standing position in the clinic and has much more forward flexion outside of the tested environment." Dr. Raquib then released Riddle from his care, diagnosing her with chronic back syndrome and degenerative changes in her back, but he concluded that the "degree of her physical symptoms are inconsistent with physical findings." Upon releasing Riddle from his care, Dr. Raquib did not restrict Riddle from working and did not make a finding as to whether her condition was caused by an on-the-job injury.
Dr. Muhammad Ali, a neurologist and pain specialist, treated Riddle for a little more than a year beginning on February 18, 1999; he saw Riddle five times during that period. Dr. Ali testified by deposition that he performed an ENG and nerve-conduction study on Riddle and that based on those tests, he "did not find any evidence of nerve damage, pinched nerves. Basically, the test was negative for any pathology." He found no evidence of herniated or bulging disks. After his complete evaluation, Dr. Ali found that Riddle was engaging in "symptom magnification," i.e., she was exaggerating the extent of her debilitation in comparison to what the tests showed her injury to be. Dr. Ali diagnosed Riddle with a degenerative disease in her spine and with depression, and stated that the fall from the ladder could have aggravated the degenerative disease. However, he also concluded that "[t]he pattern of her injury did not follow her complaints" because
"what she says is that she jarred herself; she never landed on her back; she did not hit her head from any side; she did not hit any part of her muscles directly; she just jarred with foot down. With that kind of fall, it should have communicated to the central spine and maybe done a compression fracture, or maybe have resulted in a herniated disk; and that's what we had thought initially, and that's why we did those tests, and it did not follow that."
Dr. Ali determined that Riddle had reached maximum medical improvement on April 4, 2000. He never assigned Riddle a permanent impairment rating during her visits, but upon questioning at his deposition, he placed Riddle's permanent impairment rating at between 0% and 5%. Dr. Ali never restricted Riddle from working in any way, and he concluded that there was nothing that would preclude her from performing light-duty and medium-duty work and "possibly heavy-duty job[s] also, but not outrightly."
Riddle applied for Social Security disability *1120 benefits.[1] As part of her application, Riddle was evaluated by two psychologists. Dr. Alan Blotcky, a clinical psychologist, evaluated Riddle in October 1997, at which time he diagnosed her with moderate depression. Dr. Blotcky stated in his deposition that he did not believe the 1997 injury was the cause of Riddle's depression, and he concluded that he could not say "either way" whether the depression was the result of the April 1996 injury or the January 1997 injury. He did not believe that the depression prevented Riddle from being gainfully employed, but he surmised that there would be jobs, particularly jobs involving complex tasks, that Riddle would be precluded from doing based on her intellectual ability and educational background.[2]
Clinical psychologist Dr. John Haney evaluated Riddle on July 18, 2000, and diagnosed her with moderately severe depression and as being "borderline intellectual functioning." Dr. Haney surmised that Riddle's type of injury, if it was treated and then neglected, "could lead" to depression or a worsening of already existing depression. However, he also stated that he had "no reason to think" that her on-the-job injury was the "actual cause" of her depression any more than any other possible factor. Ultimately, he concluded that Riddle's depression would not keep her from being gainfully employed.
Marcia Schulman, a witness for Southern Energy and a vocational expert with 30 years' experience, testified that she believed that Riddle had a 0% disability rating based on the records from all of the doctors and on Riddle's own deposition testimony. Schulman testified:
"[T]here was no evidence in the [medical] records that I reviewed of a physician assigning [Riddle] permanent restrictions of physical activity, and that must be present in developing and/or to justify developing a vocational disability rating on an individual, and since that was not present, there was no basis to provide a vocational disability rating, so I would have assigned her a zero."
Finally, Riddle testified concerning the timing and nature of her injuries as well as the extensive treatment she sought for her pain. Riddle stated that her supervisor knew about the April 1996 injury as soon as it happened, but she admitted that she never completed the paperwork for a workers' compensation claim for that injury. She contends that the only reason she continued to work after taking only one day off following the April 1996 injury was financial necessity, but she was unable to explain why Dr. Simieritsch never mentioned this injury or her back pain in his notes on their visits until late January 1997. Riddle testified that before her injury, she could do "anything I wanted to do," but that now she is not able to work, cannot go shopping, has difficulty driving for long periods, and, as far as household chores, can only wash clothes and cook around her house. She stated that she is in "severe pain." She testified that she was depressed because she is unable to do many of the things that she previously enjoyed, such as horseback riding and tennis, and that her financial situation is difficult; she claims that she has lost her home and her car, and that she cannot buy the medicine she needs. Riddle stated that she has seen other doctors in addition to the ones who testified by deposition or *1121 submitted medical findings for this case; among those were Dr. Hatchett, Dr. Knight, Dr. Lowe, Dr. Carter Harsh, and Dr. Jeff Long. She testified that Dr. Hatchett is an orthopedic surgeon who performed an epidural on her and had an MRI performed on her neck and back. Riddle claimed that the MRI results showed bulging disks in her neck and back, but none of Dr. Hatchett's findings were submitted into evidence.
Based on evidentiary submissions, the depositions, and oral testimony, the trial court ruled that as a result of the
"accident of January 5, 1997 ... [Riddle] sustained a permanent injury after having sustained a previous permanent injury in her employment at defendant, and the combined effect of said previous injury and said subsequent injury resulted in the permanent total disability of [Riddle]; because of said injuries and because of [Riddle's] education and training, she is unable to perform work of her trade or obtain reasonably gainful employment, resulting in her permanent and total loss of ability to earn; said injuries permanently and totally incapacitate [Riddle] from working at and being retrained for gainful employment."
The trial court awarded Riddle $363,684.32 for her disability. The Court of Civil Appeals affirmed the trial court's ruling, without an opinion. Southern Energy Homes, Inc. v. Riddle (No. 2010428, August 9, 2002), ___ So.2d ___ (Ala.Civ.App.2002)(table).

II. Analysis
The standard of review on appeal in a workers' compensation case has been stated by this Court:
"[W]e will not reverse the trial court's finding of fact if that finding is supported by substantial evidenceif that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). However, "an appellate court's review of the proof and [its] consideration of other legal issues in a workers' compensation case shall be without a presumption of correctness." Ex parte American Color Graphics, Inc., 838 So.2d 385, 387-88 (Ala.2002) (citing § 25-5-81(e)(1), Ala.Code 1975).
Southern Energy argues that Riddle failed to produce substantial evidence as to the medical causation element of her workers' compensation claim. "[F]or an injury to be compensable under the Workers' Compensation Act, the employee must establish both legal and medical causation." Ex parte Moncrief, 627 So.2d 385, 388 (Ala.1993). "Once legal causation has been established, i.e., that an accident arose out of, and in the course of employment, medical causation must be established, i.e., that the accident caused the injury for which recovery is sought." Hammons v. Roses Stores, Inc., 547 So.2d 883, 885 (Ala.Civ.App.1989).
In Ex parte Price, 555 So.2d 1060, 1061 (Ala.1989), this Court held that expert medical testimony is not required to prove medical causation by substantial evidence. Thus, it was not necessary for Riddle to present testimony from a medical expert tying her injury to her workplace accident. However, the Court also stated in Price that "[i]t is in the overall substance and effect of the whole of the evidence, when viewed in the full context of all the lay and expert evidence, and not in the witness's use of any magical words or phrases, that the test finds its application." Price, 555 *1122 So.2d at 1063 (citing Odell v. Myers, 52 Ala.App. 558, 295 So.2d 413 (1974)) (emphasis omitted; emphasis added).
None of the doctors who treated Riddle stated with any degree of certainty that Riddle's back condition was due to the alleged workplace injury. The records of Dr. Simieritsch, Riddle's personal physician, do not mention the April 1996 injury or Riddle's complaining about back pain in any of her seven visits to Dr. Simieritsch after that incident but before late January 1997 when she left Southern Energy's employ permanently. Riddle admitted that Dr. Simieritsch had no records of such an injury before January 1997, but claimed that when she subsequently mentioned it to him, he stated that he "forgot" about it. Dr. Fisher initially stated, before he performed any tests, that it was "possible" that Riddle's back condition was caused by the fall from the ladder, but after several visits and tests, he concluded that Riddle's back condition was caused by normal degeneration for someone her age and that he could not point to anything "objective," i.e., anything other than Riddle's own complaints, that demonstrated that Riddle had even suffered an injury to her back. Dr. Raquib did not make a finding as to whether Riddle's condition was caused by an on-the-job injury. Dr. Ali testified that the April 1996 injury could have aggravated Riddle's degenerative disk disease. However, this testimony was mitigated by Dr. Ali's further testimony that "[t]he pattern of her injury did not follow her complaints," meaning that the possibility that Riddle's back injury was caused by her fall from the ladder was remote.
These were the only expert medical opinions admitted into evidence at trial. Even viewed in the light most favorable to Riddle, the testimony of these doctors at best established a possibility that Riddle's back condition was caused by her alleged on-the-job injury. "It is a well established principle that evidence presented by a [workers'] compensation claimant must be more than evidence of mere possibilities that would only serve to `guess' the employer into liability." Hammons, 547 So.2d at 885. Yet possibilities are all that Riddle's many doctors could provide. Thus, the only evidence of medical causation of the back injury came from Riddle's own testimony.
The same holds true for Riddle's depression. Dr. Blotcky stated that he could not conclude whether either of Riddle's on-the-job accidents caused her depression. Although Dr. Haney speculated, based on a hypothetical question, that a failure to treat such an injury could lead to depression, he stated that he had no actual basis to think that Riddle's on-the-job injuries were the cause of her depression. Again, mere possibilities and speculation cannot establish medical causation, yet that is all that the clinical psychologists provided concerning the relation between Riddle's on-the-job injuries and her depression. As was the case with her back condition, the only basis for tying Riddle's depression to her on-the-job accidents is her own testimony.
Looking at the "overall substance" of the evidence, "viewed in the full context of all the lay and expert evidence," Price, 555 So.2d at 1063, Riddle's testimony alone cannot be said to constitute "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer" medical causation. West v. Founders Life Assurance Co., 547 So.2d at 871. This is not to say that a plaintiff's testimony alone can never constitute substantial evidence of medical causation, but rather that in this case the evidence as a whole weighs heavily against finding the plaintiff's testimony alone to be substantial evidence of medical causation.
*1123 In addition to the lack of proof of medical causation, there is also a lack of evidence indicating that Riddle sustained a permanent total disability. "Permanent total disability is the inability to perform one's trade and the inability to find other gainful employment." Jim Walter Res., Inc. v. Budnick, 619 So.2d 926, 927 (Ala. Civ.App.1993) (citing § 25-5-57(a)(4)d., Ala.Code 1975). None of Riddle's doctors placed restrictions on her work status after May 1998. Three of the physicians as well as the physical therapist who treated Riddle stated that Riddle's symptoms and complaints were not consistent with the medical testing and her behavior at various times. Most importantly, none of the doctors, psychologists, or experts stated after examining Riddle that Riddle was incapable of gainful employment.[3]
In fact, Dr. Fisher could not cite any objective information that would warrant an impairment rating; Dr. Raquib did not place any work restrictions on Riddle even after sending her to physical therapy; neither clinical psychologist thought that Riddle's depression would prevent her from being gainfully employed; and the only vocational expert to testify gave Riddle an impairment rating of zero percent. Dr. Ali was the only physician to give Riddle an impairment rating, stating that her impairment as a result of the injuries was at most 5%, and he concluded that Riddle could perform light-, medium-, and even heavy-duty work, given the right conditions. The only caveat any of these individuals placed on Riddle's job prospects was that she probably could not perform jobs involving complex operations because of her intellectual capacity and level of education. This is far from finding an "inability to find other gainful employment." Once again, while Riddle's testimony as to her ability to work certainly constitutes a modicum of evidence indicating that she possesses a permanent total disability, in this case it cannot be said to constitute substantial evidence of such a disability, particularly when one considers that some of the doctors indicated that Riddle tended to exaggerate her symptoms.
In short, we conclude that Riddle failed to present substantial evidence of medical causation between her on-the-job incidents and her condition and that she failed to produce substantial evidence indicating that she sustained a permanent total disability. The Court of Civil Appeals' judgment affirming the trial court's judgment is therefore due to be reversed. Despite Southern Energy's invitation, we decline to adopt a per se rule that expert medical testimony is necessary to prove medical causation for injuries such as the one sustained by Riddle in this case. Instead, we reaffirm that all of the evidence, *1124 including expert and lay testimony, must be examined as a whole to determine whether substantial evidence of medical causation has been shown in a workers' compensation case. The cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SEE, BROWN, and STUART, JJ., concur.
HOUSTON, J., concurs specially.
LYONS, JOHNSTONE, HARWOOD, and WOODALL, JJ., dissent.
HOUSTON, Justice (concurring specially).
What is substantial evidence of permanent, total disability in a workers' compensation claim involving a soft-tissue injury? In my opinion, if such a claim is disputed by credible expert medical testimony, the claimant must offer credible expert medical testimony in support of the claim for his or her claim to be supported by substantial evidence. The claimant in this case did not do so; therefore, I concur.
LYONS, Justice (dissenting).
I must respectfully dissent.
The Workers' Compensation Act was amended in 1992 to provide that "[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." § 25-5-81(e)(2), Ala.Code 1975. The issue is not whether five of us would have reached the same result as that reached by the trial court. We must analyze the record to determine if that result is supported by substantial evidence.
I am concerned about the inconsistency of the main opinion with what heretofore were considered settled principles of law. In Ex parte Price, 555 So.2d 1060 (Ala. 1989), a case also involving a claimant with back pain, this Court held that medical causation as an element of the employee's burden of proof in a workers' compensation case could be found from evidence other than that supplied by the testimony of doctors. This Court embraced the view expressed by Professor Larson in his treatise The Law of Workmen's Compensation:
"`True, in many instances it may be impossible to form a judgment on the relation of the employment to the injury, or relation of the injury to the disability, without analyzing in medical terms what the injury or disease is. But this is not invariably so.'"
555 So.2d at 1061-62 (quoting 3 A. Larson, The Law of Workmen's Compensation § 79.51(a), at 15-426.128 (1988)). This Court then turned to situations where medical evidence was not always necessary and again quoted from Professor Larson:
"Professor Larson gives several examples where the factfinder is authorized to find the causation element absent medical evidence to that effect:
"`. . . .
"`The Rhode Island Supreme Court's opinion in Valente [v. Bourne Mills, 77 R.I. 274, 75 A.2d 191 (1950) ], continued, on the subject of the lack of medical testimony on causation, as follows:
"`"Thus where, as in the instant case, injury appears in a bodily member reasonably soon after an accident, at the very place where the force was applied and with symptoms observable to the ordinary person, there arises, in the absence of believed testimony to the contrary, a natural inference that the injury, whatever may be the medical name, was the result of the *1125 employment." [77 R.I. at 279, 75 A.2d at 194.]
"`One of the most familiar applications of this approach is to back injuries that occur suddenly as a result of an obvious accident or strain.'"
555 So.2d at 1062 (quoting 3 A. Larson, The Law of Workmen's Compensation § 79.51(b), (c), at 15-426.149 to .160 (1988)) (emphasis added).
In Ex parte Trinity Industries, Inc., 680 So.2d 262 (Ala.1996), a case governed by the Workers' Compensation Act as amended in 1992, an employee suffered a stroke while he was at work. The employee could not pinpoint a specific incident as the cause of his stroke, but he contended that his repeated exposure to stressful activity made his stroke job related. Before laying down a special rule for injuries not the result of a sudden and traumatic event, this Court reiterated the following rule:
"An employee claiming to have been injured by a sudden and traumatic external event (an `accident' in the colloquial sense, e.g., being struck by a falling hammer on a construction site or slipping off a ladder) need only produce substantial evidence tending to show that the alleged `accident' occurred and tending to establish `medical causation,' by demonstrating that the `accident' was a contributing cause of the complained-of injuries and complications."
680 So.2d at 266 n. 3 (emphasis added). The Court then concluded that the issue of the causation of a stroke fell within the exception recognized in Price whereby medical evidence was necessary "[b]ecause the nature and origin of strokes is obviously beyond the understanding of the average person." Id. at 269. However, in requiring medical evidence of causation, this Court embraced a minimal standard of proof by treating as sufficient the testimony of the employee's expert, Dr. Gordon Kirschberg, that he "`would think that if they are chronically hypertensive vessels and you give one last push to the blood pressure it may cause some spasm or little clots to fall off and that may, in fact, be the cause of the stroke.'" Id. at 270 (emphasis added). The Court concluded:
"Although Dr. Kirschberg's testimony seems to be weak and at points contradictory, he does conclude that the cardiovascular stress, associated with the strenuous work that Cunningham had been performing for four and one-half hours before collapsing while on a break, could have precipitated the onset of Cunningham's stroke."
Id. at 270-71 (emphasis added).
This Court explicitly endorsed in Price Professor Larson's observation that a back injury occurring suddenly as the result of an obvious injury or strain was one of the most "familiar applications" of the rule that, absent believed evidence to the contrary, there arises "`a natural inference that the injury, whatever may be the medical name, was the result of the employment.'" 555 So.2d at 1062 (quoting Valente v. Bourne Mills, 77 R.I. 274, 279, 75 A.2d 191, 194 (1950)) (emphasis added). I do not read Trinity Industries as having overruled Price, especially as it relates to a back injury that occurs as a result of an accident such as falling off a ladder. See Trinity Indus., 680 So.2d at 266 n. 3. Here, the trial court believed that Riddle fell from a ladder and thereafter suffered pain as a result of her work-related injury. Riddle testified:
"Q. Okay. You say you landed flat-footed [after falling from the ladder]. Did you experience any pain?
"A. I went numb from the waist down. I couldn't move, and my shoulder, my elbow was paining me. I just stood there, and my supervisor asked me if I was hurt, and they *1126 started to touch me and I told them, `Don't touch my [sic] just yet.' I said, `I don't know what is wrong.' I said, `I can't move.'
". . . .
"Q. Did you go to work the next day?
"A. No.
"Q. Why not?
"A. Well, I got home and I was hurting so bad I just went to bed and that is where I stayed.
"Q. All right. When did you go back to work?
"A. The following Monday.
"Q. Were you free of pain at that time?
"A. No, I was not.
". . . .
"Q. Tell the Judge where your pain was located on your body.
"A. My neck, my elbow, my back, my leg, my hands.
"Q. Did you continue to work for Southern Energy after this injury?
"A. Yes.
". . . .
"Q. How were you able to perform your job duties after this injury?
"A. I took the strongest aspirins I could, well, non-aspirin, that I could find and gritted my teeth and done the best I could.
"Q. All right. You stated earlier that you had received a second injury [while operating a vacuum cleaner]; is that correct?
"A. That is correct.
". . . .
"Q. You stated that your back was paining you when you were operating the vacuum. Was this different from the prior pain you were suffering?
"A. It was more severe but in the same area.
"Q. Tell the Judge where it was located.
"A. In my lower back, in my arm.
"Q. Were you able to continue to work that day?
"A. No.
"Q. Have you ever returned to Southern Energy after that day?
"A. No.
". . . .
"Q. Prior to April of 1996, had you had any prior injuries to your back or elbow?
"A. No.
"Q. What about your neck?
"A. No."
Furthermore, one of Riddle's physicians testified that her injury was a "possible" cause of her condition.
Even if the soft-tissue injuries complained of here fall under the heading of those instances recognized in Price where "`it may be impossible to form a judgment on the relation of the employment to the injury, or relation of the injury to the disability, without analyzing in medical terms what the injury or disease is,'" 555 So.2d at 1061-62 (quoting Larson at § 79.51(a)), the express reference in Price to back injuries notwithstanding, the standard of proof of medical causation required by the main opinion is more stringent than that employed in Trinity Industries.
The trial court chose to disbelieve evidence contrary to Riddle's testimony and drew the "natural inference" that her injury was the result of her employment. The main opinion impermissibly reweighs this evidence and disregards findings made by the trial court based on ore tenus evidence in a workers' compensation case, thereby sub silentio overruling legions of cases. See, e.g., Ex parte Golden Poultry Co., 772 *1127 So.2d 1175, 1176 (Ala.2000), in which this Court stated:
"It is well `settled that the trial court's findings on disputed evidence in a workers' compensation case are conclusive.' Moreover, the 1992 amendments to the Workers' Compensation Act `did not alter the rule that [the Court of Civil Appeals] does not weigh the evidence before the trial court.'"
(Citations omitted.) See also Ex parte Drummond Co., 837 So.2d 831, 832-33 (Ala.2002); Ex parte Kmart Corp., 812 So.2d 1205, 1207 (Ala.2001). The trial court's observations are of critical importance in a workers' compensation case. "`The trial court is in the best position to observe the demeanor of the employee and other witnesses. In arriving at its judgment, the court may consider all evidence, including its own observations, and interpret it according to its own best judgment.' " Ex parte Alabama Ins. Guar. Ass'n, 667 So.2d 97, 101 (Ala.1995) (quoting Williams v. Lee Apparel Co., 610 So.2d 410, 412 (Ala.Civ.App.1992)) (citations omitted).
The main opinion sub silentio rejects Price and the dicta in Trinity Industries as to the proof necessary in a workers' compensation claim involving a back injury caused by an obvious accident. Furthermore, as far as soft-tissue injuries of the nature alleged by Riddle are concerned, not only does the main opinion conclude that medical evidence is now necessary, the main opinion also requires more than merely a possibility of medical causation, as was found to be acceptable in Trinity Industries. Therefore, the main opinion appears to have elevated Riddle's burden of proof to clear and convincing evidence, as opposed to a preponderance of the evidence. Such a result is authorized only in instances where an employee's injuries have resulted from "gradual deterioration or cumulative physical stress disorders." See § 25-5-81(c). The main opinion apparently has reweighed the evidence Riddle presented as to her fall from the ladder, which the trial court obviously found credible, and rejected it in favor of the view that Riddle's injury was nonaccidental. If this be so, the main opinion has also sub silentio overruled the holding in Trinity Industries as to the degree of proof of medical causation in workers' compensation cases involving nonaccidental injuries.
Because the main opinion rejects Riddle's evidence concerning causation, I express no opinion on the sufficiency of the evidence presented at trial concerning the degree of Riddle's disability.
WOODALL, J., concurs.
JOHNSTONE, Justice (dissenting).
I respectfully dissent. The main opinion holds, in effect, that Riddle's own testimony did not constitute substantial evidence because it was disputed by or uncorroborated by the testimony of other witnesses. The presence of countervailing evidence and the absence of corroborating evidence are immaterial to the issue of whether the testimony of a competent witness constitutes substantial evidence. See Ex parte Coleman, 861 So.2d 1080 (Ala.2003).
The contrast between § 12-21-12(d), Ala.Code 1975, defining "substantial evidence," and § 6-11-20(b)(4), Ala.Code 1975, defining "clear and convincing evidence," is instructive. These two statutes, respectively, read:
"(d) Substantial evidence shall mean evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions as to the existence of the fact sought to be proven. A scintilla of evidence is insufficient to *1128 permit submission of an issue of fact to the trier of facts."
§ 12-21-12(d).
"Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
§ 6-11-20(b)(4). While the definition of "clear and convincing evidence" requires a comparison between the supporting evidence and any countervailing evidence, the definition of "substantial evidence" is independent of any consideration of countervailing evidence.
Riddle's competency, as distinguished from her credibility, is established by the record and is not disputed by the defendant. Riddle's credibility was for the trial judge, not this Court, to determine. Knight v. Beverly Health Care Bay Manor Health Care Ctr., 820 So.2d 92 (Ala.2001); Ex parte Anonymous, 803 So.2d 542 (Ala. 2001); Ex parte Pielach, 681 So.2d 154 (Ala.1996); B.F. Goodrich Co. v. Lee, 271 Ala. 312, 123 So.2d 117 (1960); 3-M Co. v. Myers, 692 So.2d 134 (Ala.Civ.App.1997).
But for one exception, I concur in Justice Lyons's scholarly dissent. The exception is that I hope today's main opinion will, in the future, be treated simply as a lapse rather than a sub silentio overruling of so much bedrock workers' compensation precedent.
WOODALL, J., concurs.
HARWOOD, Justice (dissenting).
I dissent. I agree with Justice Lyons and Justice Johnstone that Riddle's testimony was sufficient to constitute substantial evidence of medical causation. As explained in the excerpt from Dolphin Homes v. Issa, 428 So.2d 102 (Ala.Civ.App. 1983), set out later in this writing, expert testimony concerning medical causation was therefore not necessary. I write further, however, to express my separate view about certain statements in the respective dissents of Justice Lyons and Justice Johnstone.
Section 25-5-81(e), Ala.Code 1975, provides that any party aggrieved by a final judgment in a workers' compensation case may "appeal" to the Court of Civil Appeals. Section 25-5-81(c) states that the decision of the trial court "shall be based on a preponderance of the evidence as contained in the record of the hearing...," except in cases where the injury is alleged to have resulted from "gradual deterioration or cumulative physical stress disorders...." Subsection (e)(1) directs that "[i]n reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness." That mandate does not expressly and directly implicate the standard of review this Court should apply in undertaking its independent review following the issuance of the writ of certiorari to the Court of Civil Appeals. Subsection (e)(2) provides that "[i]n reviewing pure findings of fact, the findings of the circuit court shall not be reversed if that finding is supported by substantial evidence." The "standard of proof set forth herein," § 25-5-81(e)(1), is that supplied by § 25-5-84(e)(2), i.e., "substantial evidence." Although the Workers' Compensation Act, of which § 25-5-81(e) is a part, does not define "substantial evidence," this Court noted in Ex parte Trinity Industries, Inc., 680 So.2d 262, 268 (Ala.1996), that "substantial evidence," as that term is used in § 12-21-12(d), Ala.Code *1129 1975, has been defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Thus, as this Court explained in Trinity Industries, 680 So.2d at 268-69:
"[U]nder the applicable standard of review, we will not reverse the trial court's finding of fact if that finding is supported by substantial evidenceif that finding is supported by `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the facts sought to be proved.'"
Before the addition of § 25-5-81(c) and (e) to the Workers' Compensation Act in 1992, direct appellate review of a final judgment in a workers' compensation case was by petition for a writ of certiorari pursuant to what was former § 25-5-81(d). Faddis v. Woodward Iron Co., 276 Ala. 283, 161 So.2d 486 (1964); Fordham v. Southern Phenix Textiles, Inc., 387 So.2d 204 (Ala.Civ.App.1980). The standard of review was that commonly referred to as the "any legal evidence" test: "If there [was] any legal evidence that supports the findings of the trial court, this Court [would] affirm those findings." Lowe v. Walters, 491 So.2d 962, 964 (Ala.Civ.App. 1986).
"The law is well settled in this jurisdiction that this court does not look at the weight of the evidence as to any fact found by the trial court but it does look to see if there is any evidence to support the facts found by the trial court. Stewart v. Busby, 51 Ala.App. 242, 284 So.2d 269 (1973). Moreover, we know of no requirement that `any evidence' must be interpreted to mean any `expert medical evidence.' Stewart v. Busby, supra. Furthermore, in workmen's compensation cases the trier of fact is not bound by medical opinion testimony. Dale Motels, Inc. v. Crittenden, 50 Ala.App. 251, 278 So.2d 370 (Ala.Civ.App.1973)."
Dolphin Homes, 428 So.2d at 103.
It is patent that the Legislature intended by the addition of § 25-5-81(e)(1) and (2) to change appellate review of final judgments in workers' compensation cases so that the review would be by way of appeal; the standard of review would be without a presumption of correctness as to the standard of proof (substantial evidence) and "other legal issues," and the trial court's judgment based on "pure findings of fact" would not be reversed if its findings were "supported by substantial evidence." It is true, as Justice Lyons notes in his dissent, that subsequent to the 1992 amendments to the Workers' Compensation Act this Court stated, in Ex parte Golden Poultry Co., 772 So.2d 1175, 1176 (Ala.2000):
"It is well `settled that the trial court's findings on disputed evidence in a workers' compensation case are conclusive.' Ex parte Ellenburg, 627 So.2d 398, 399 (Ala.1993). Moreover, the 1992 amendments to the Workers' Compensation Act `did not alter the rule that [the Court of Civil Appeals] does not weigh the evidence before the trial court.'"
Although Ex parte Ellenburg, 627 So.2d 398 (Ala.1993), on which the Golden Poultry Court relied, was decided on April 16, 1993, 11 months after the 1992 amendments to the Workers' Compensation Act became effective on May 19, 1992, it involved a review by petition for a writ of certiorari of a decision of the Court of Civil Appeals issued October 30, 1992, in a case filed in October 1989. Universal Forest Prods. v. Ellenburg, 627 So.2d 395 (Ala. Civ.App.1992). Although the respective dates of the trial, the entry of the trial *1130 judge's final judgment, and the filing of the appeal are not provided in the opinion of the Court of Civil Appeals, one can readily infer from other information in the opinion that all of those events took place before the effective date of the 1992 amendments. At any rate, neither the parties nor the Court of Civil Appeals considered the newly enacted provisions, now codified as § 25-5-81(c) and (e), to have any application to the case, and the opinion takes no note of them. Therefore, the Court of Civil Appeals stated, and relied on, the pre-1992 proposition that the initial step in its review was to "determine if there is any legal evidence to support the trial court's findings." 627 So.2d at 397. Likewise, after this Court granted the petitions of both parties for certiorari review, it accepted as applicable the "any legal evidence" standard and noted that "[i]t is further settled that the trial court's findings on disputed evidence in a workers' compensation case are conclusive." Ex parte Ellenburg, 627 So.2d at 399. The Supreme Court, like the Court of Civil Appeals, did not mention § 25-5-81(c) or (e), apparently because neither party argued the applicability of those subsections or, given the time frame of all of the prior proceedings, they were not otherwise deemed applicable.
Thus, neither of the two Ellenburg opinions dealt with the effect of § 25-5-81(c) and (e) on the standard of proof required at the trial level or the standard of appellate review.
When this Court in Golden Poultry, supra, applied § 25-5-81(e)(1) and (2) in that case, decided in April 2000, as the "applicable standard of review," it nonetheless quoted the rule from Ex parte Ellenburg that a trial court's findings based on disputed evidence are "conclusive." 772 So.2d at 1176.
Before the 1992 amendments, a trial judge's findings of fact were "conclusive" if there was "any legal evidence" to support those findings. I agree that, even after the 1992 amendments, a trial judge's findings based on disputed facts are conclusive, if the factual findings are the result of a determination made after a hearing at which those facts are presented by witnesses whose credibility the trial judge must assess. On the other hand, the Court of Civil Appeals is now obliged under § 25-5-81(e)(1) to review "the standard of proof ... and other legal issues... without a presumption of correctness" and when a trial judge's "pure findings of fact" are reviewed, they must be upheld, under § 25-5-81(e)(2), only if they are supported by substantial evidence. In that respect, then, it is no longer correct to state categorically for all "applications" that a trial judge's findings of fact on disputed evidence are conclusive. In deciding the mixed question of law and fact of whether the trial judge's finding that the substantial evidence standard has been met, we independently review that evidence, giving due deference to the trial court's resolution of disputed issues of fact, to determine if it is of "such weight and quality" that it meets the criteria for substantial evidence. As Justice Cook stated in his special concurrence in Ex parte Northam, 689 So.2d 854, 857 (Ala.1996), another workers' compensation case: "The substantial evidence test, by its nature, requires that the court assess or weigh evidence and determine whether fair-minded persons exercising impartial judgment could reasonably infer the existence of the fact sought to be proved."
As Justice Lyons notes in his dissent in this case, the "conclusiveness" proposition has been reiterated in two recent opinions of this Court, Ex parte Drummond Co., 837 So.2d 831, 832-33 (Ala.2002), and Ex parte Kmart Corp., 812 So.2d 1205, 1207 *1131 (Ala.2001). In Ex parte Drummond, the Court properly noted that § 25-5-81(e)(1) and (2) set forth the applicable standard of review in a workers' compensation case, but then added the statement:
"See also Ex parte Golden Poultry Co., 772 So.2d 1175, 1176 (Ala.2000). The trial court's findings of fact `"on disputed evidence in a workers' compensation case are conclusive."' Ex parte Golden Poultry, 772 So.2d at 1176 (quoting Ex parte Ellenburg, 627 So.2d 398, 399 (Ala. 1993))."
However, the actual holding in Ex parte Drummond was that the trial court erred because "[i]t did not have before it substantial evidence" supporting its determination that a "scheduled" injury should be compensated as "an unscheduled" injury. 837 So.2d at 836. In Ex parte Kmart Corp., the trial court found that one condition from which the employee suffered was compensable, but that her fibromyalgia was not compensable, and it made various factual findings in support of its determinations. On appeal, the Court of Civil Appeals rejected the trial court's finding that the fibromyalgia was not a compensable injury and also concluded that the percentage of loss of earning power the trial judge had assigned to the compensable injury was inadequate. On certiorari review, this Court noted that § 25-5-81(e)(2) established the standard of review for "pure findings of fact" in a workers' compensation case, and that, under that standard, a judgment based on such findings would not be reversed if the findings were supported by substantial evidence. This Court noted that the Court of Civil Appeals was authorized in a workers' compensation case to determine whether the trial court's decision was supported by sufficient evidence, i.e., substantial evidence, but, citing earlier caselaw, stated that it could not independently weigh the evidence. 812 So.2d at 1207. We concluded that the record contained substantial evidence in support of the trial court's finding that the employee's fibromyalgia was not a compensable injury, and we reversed the judgment of the Court of Appeals on that point. In discussing the loss-of-earning-capacity issue, we commented that "[t]he trial court's findings, if supported by the evidence, are conclusive," 812 So.2d at 1210, citing Ex parte Golden Poultry, but then phrased our review in terms of whether the trial court's finding that the employee had suffered a particular degree of earning loss "was supported by substantial evidence."
Because pursuant to § 25-5-81(e) the Court of Civil Appeals now reviews the trial court's application of the standard of proof, i.e., substantial evidence, without a presumption of correctness, and must assess whether the trial judge's "pure findings of fact" are supported by substantial evidence, there is necessarily a "reweighing" of the evidence at the appellate level, for that limited purpose. Likewise, the trial judge's factual findings based on disputed issues of fact are not conclusive unless they are supported by substantial evidence.
NOTES
[1] Both Riddle and her husband receive Social Security disability benefits. Riddle testified that her husband is handicapped and that he has cancer.
[2] Riddle finished the seventh grade in school. She attempted at one time to get a GED certificate, but the evidence was conflicting as to whether she actually got the certificate.
[3] Indeed, Riddle herself acknowledged on the stand that this was the case:

"Q. No doctor has restricted you from working since 1997; have they?
"A. No.
"Q. Okay. Has any doctor, since 1997, said that you cannot return to work or that you can't try to find a job?
"A. No.
"Q. No doctor has said that you are physically incapable of getting a job; have they?
"A. No.
"Q. No doctor has said that you are psychologically incapable of getting a job; have they, Ms. Riddle?
"A. No.
"Q. And you have seen, since these alleged injuries, you have seen, let me try to make a list and you tell me if I'm leaving somebody off or adding somebody I shouldn't[:] Dr. Simieritsch, Dr. Fisher, Dr. Raquib, Dr. Raquib's therapist, Dr. Ali, Dr. Blotcky, Dr. Haney, Dr. Lowe, Dr. Jeff Long, Dr. Carter Harsh, Dr. Knight and Dr. Hatchett; is that correct?
"A. Correct."