THOMPSON, Presiding Judge.
Albert Dean Gore appeals from the judgment of the Shelby Circuit Court (“the trial court”) finding that a work-related injury to Gore resulted in a permanent partial disability of 10% and awarding workers’ compensation benefits accordingly-
The record indicates the following. Gore worked for Lafarge North America, Inc. (“Lafarge”), as a heavy-equipment operator. On February 12, 2008, Gore was operating a Caterpillar brand bulldozer at a quarry. The bulldozer had an enclosed cab that was reinforced with steel beams. Gore positioned the bulldozer under a chute or tube through which crushed lime and cement rocks were being fed. While the bulldozer was stopped, the crushed rock was dumped from a height of about 30 feet directly onto the bulldozer. Gore testified that some of the rocks, which measured between 10 and 12 inches in diameter, entered the cab of the bulldozer, striking him on his right side, leg, shoulder, and neck. Gore completed his shift for the day, but he visited La-, farge’s workers’ compensation doctor the next day, complaining of pain in his neck, upper back, and right shoulder. The X-rays taken at the time did not reveal any detectable injuries. The doctor prescribed narcotic pain medication for Gore and released him to return to light duty.
On February 14, 2008, the day after he visited the workers’ compensation doctor, Gore visited his family physician for complaints of pain similar to those he had made to the workers’ compensation doctor, and he requested medication to help him with his pain. Gore told his family physician that he did not know the cause of his pain, and he did not divulge that he had been to see a workers’ compensation doctor the day before. His family physician prescribed a refill of the pain medication Lortab, which Gore had been taking in the months leading up to the February 12, 2008, accident (“the accident”).
In June 2008, Gore was still experiencing pain, and he began treatment with Dr. Colburn Maher at St. Vincent’s Occupational Clinic in Birmingham. In the summer of 2008, Dr. Maher had Gore “taken off work,” and Gore has not worked since that time. The record indicates that from December 20, 2007, up to and including February 8, 2008, i.e., four days before the accident, Gore had his prescription for hy-drocodone, a narcotic pain killer, refilled ten times. He also had taken short-term disability leave three times before the accident — the most recent being four 'months before the accident. Gore testified that he took the leave once to have surgery on his elbow and again when his lung collapsed. He also said that he took time off from work when he was convicted of what the parties called “doctor shopping,” i.e., visiting several doctors to obtain multiple prescriptions for Xanax.
At the hearing, Gore acknowledged that during his deposition he had testified that he had never experienced back or neck pain before the accident. However, Gore’s supervisor, Joe Archer, testified that, before the accident, Gore had a problem with “excessive absenteeism,” or absences that Lafarge was not aware of in advance. Archer said that throughout his tenure as Gore’s supervisor, that is, from 2008 until January 2008, Gore would say that he was physically unable to work, “complaining about his neck, about his back, about his shoulder, and about his foot.” Archer said that he had left his job at Lafarge before the accident; therefore, the complaints Gore made to Archer about neck and back *746 pain had to have been made before the accident.
In addition, Gore’s medical records indicate that in December 2002 he visited Chil-ton Family Medicine complaining of back pain. At that time, Gore was referred to a chiropractor and was prescribed the narcotic Lortab. In 2004 Gore was treated for “nerves” and pain, weakness, and numbness in his back and arms. Then, on December 4, 2007 — three months before the accident — Gore visited Dr. Howard complaining of “a lot of back pain.” In January 2008, he returned to Dr. Howard for continuing back pain. On January 29, 2008, about two weeks before the accident, Gore again saw Dr. Howard for pain radiating from his neck to other parts of his body, including his chest wall. Dr. Howard ordered a nerve-conduction study. It is not clear from the record when the nerve-conduction study was performed; however, on February 28, 2008, Gore returned to Dr. Howard to obtain the results of that study, which showed radiculopathy, a nerve condition, at his left seventh thoracic vertebra and “severe” bilateral carpal tunnel syndrome.
In addition to being treated by Dr. Howard, Gore also continued to be treated by workers’ compensation doctors for pain in his neck, right shoulder, and mid-back. On May 2, 2008, an MRI was performed that indicated that Gore had arthritis in his neck, as well as radiculopathy in his neck. Gore was referred to Dr. Maher, a neurosurgeon at St. Vincent’s Occupational Clinic, for continued treatment.
Dr. Maher testified that Gore had arthritis at almost every level of his spine and that it was most severe in his neck. Gore also suffered from bone spurs and pinched nerves in his neck. After more conservative treatment was unable to relieve the pain in Gore’s neck, Dr. Maher performed surgery to remove several disks and the bone spurs that were compressing the nerves in Gore’s neck. The second part of the procedure, Dr. Maher said, was a bone graft designed to maintain the alignment of the neck and fuse four neck bones together. Dr. Maher also put a titanium plate in Gore’s neck.
Dr. Maher was “underwhelmed” with the rate at which the bones in Gore’s neck were growing after the bone graft. He testified that months after the surgery Gore was still experiencing pain, so Dr. Maher referred him to another' physician for pain management. A year after the surgery, Dr. Maher said, two of the three levels of vertebrae in Gore’s neck where the graft had been done had not fused. Ultimately, a second surgery was performed on September 28, 2010, in an effort to “revise” the fusion. The metal plate that had been inserted during the first surgery was removed and other screws and “instrumentation” were inserted in Gore’s cervical vertebrae. Dr. Maher said that after the second procedure Gore’s neck pain improved. As Dr. Maher continued to monitor Gore after the second surgery, he determined that Gore had developed a new bone spur in his neck. Gore has continued to suffer neck pain.
Dr. Maher ordered a functional-capacity evaluation (“FCE”) for Gore. After the FCE was completed, Dr. Maher placed Gore at maximum medical improvement (“MMI”) and assigned him a permanent-partial-impairment rating of 20%. Dr. Maher explained that when three levels of vertebrae are fused, “it would be incredibly hard to return to activity [such as] driving, turning, doing anything with heavy mechanical operations.” With four levels of fusion, Dr. Maher said, such activity would be “very challenging.” Dr. Maher testified that he did not believe that Gore could perform mechanical activity or driving. He believed Gore could do light- *747 duty work, but he said that, even then, Gore would require frequent breaks so that he is not in one position too long. On January 6, 2012, Dr. Maher performed a CT scan on Gore’s neck and determined that, at that time, Gore had a “solid fusion.”
As to the cause of Gore’s neck issues, Dr. Maher initially testified that although Gore suffered from degenerative and congenital conditions, there was also “clearly a pinched nerve in his neck from the moment I met him, through this whole process.” Dr. Maher testified that, based on the history that Gore had provided to him, he believed that the accident caused the pinched nerve. Later in his deposition, however, he acknowledged that the physical problems Gore was experiencing in his neck, back, and shoulder could have occurred even if the accident had not happened. He stated that it was “very challenging to separate degenerative from acute,” and he reiterated that he had relied on Gore’s subjective statements that his neck problems began with the accident when connecting those problems with the accident.
In addition to the medical history described above, the record indicates that Gore received further treatment for neck pain after he fell while playing with his granddaughter on June 10, 2010. Gore went to the emergency room for treatment on that occasion, then mentioned the fall to Dr. Maher during a visit on June 25, 2010. Dr. Maher testified that, during that visit, Gore complained of worsening neck pain and pain in his right shoulder, and Dr. Maher was concerned that the fall may have “worsened” Gore’s neck condition.
In his complaint, Gore claimed that the injuries he sustained in the accident caused him to suffer from depression. Gore’s medical records indicate that he complained of depression during at least the eight years leading up to the accident. After the trial, the trial court entered its finding that Gore had suffered a permanent partial disability as a result of the accident. In the judgment, the trial court noted Gore’s complaints of back and neck pain in the five years leading up to the accident, as well as his receipt of short-term disability on three occasions, the most recent being only four months before the accident. The trial court also noted Gore’s continuous use of narcotic pain relievers in the two months leading up to the accident. Furthermore, the trial court found that it had grounds on which to question Gore’s credibility, based on his conviction for doctor shopping and Gore’s inconsistent testimony; for example, Gore testified that he. had one DUI conviction when, in fact, he had four DUI convictions. The trial court also referred to Gore’s “plain mischaracterizations” when talking to his treating physicians in this case.
The trial court determined that the evidence demonstrated “several alternative theories” for Gore’s “present state.” Based on the evidence presented, the trial court concluded that Gore had not carried his burden of proving that he had suffered a permanent total disability as a result of the accident. The trial court noted that Dr. Maher had assigned Gore an impairment rating of 20% to the body as a whole; however, the trial court said, that figure was not based solely on the on-the-job injury. Instead, the trial court said, the 20% impairment figure assigned by Dr. Maher took into account all of Gore’s previous injuries and
“[t]he disability rating also considers the possibility that [Gore’s] degenerative and congenital problems could have been exacerbated by the on-the-job injury but that they also worsened as a result of the aging process in the intervening four years between the date of *748 the accident and when he reached [MMI]. Given these facts, it is clear that the on-the-job injury is but one factor in his present disability rating, but, standing alone, is not the cause of his present state.”
The trial court then found “that the [February 12, 2008,] injury to the plaintiff resulted in a permanent partial disability of 10% and awarded benefits “consistent with Ala.Code [1975], § 25-5-57(a)(3).”
Gore timely appealed from the judgment.
The standard this court uses to review workers’ compensation cases is well settled:
“Section 25-5-81(e), Ala.Code 1975, provides the standard of review in workers’ compensation cases:
“‘(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“ ‘(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.’ '
“Substantial evidence is ‘ “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).”
White Tiger Graphics, Inc. v. Clemons, 88 So.3d 908, 910 (Ala.Civ.App.2012).
Moreover,
“ ‘[f]or an injury to be compensable under the Workers’ Compensation Act, the employee must establish both legal and medical causation.’ Ex parte Moncrief, 627 So.2d 385, 388 (Ala.1993). ‘Once legal causation has been established, i.e., that an accident arose out of, and in the course of employment, medical causation must be established, i.e., that the accident caused the injury for which recovery is sought.’ Hammons v. Roses Stores, Inc., 547 So.2d 883, 885 (Ala.Civ.App.1989).”
Ex parte Southern Energy Homes, Inc., 873 So.2d 1116, 1121 (Ala.2003).
Gore contends that the trial court applied the incorrect evidentiary standard regarding a worker’s preexisting condition and the burden of proof the worker has in demonstrating his or her claim of permanent total disability. Specifically, Gore asserts that the trial court improperly considered his prior complaints of pain and depression as preexisting conditions and used those complaints to “offset” his award of benefits. Because he was able to do his job normally at the time of the accident, Gore says, there was no preexisting condition that the trial court could consider for purposes of determining workers’ compensation benefits. Gore points out that, by determining that the accident was “one factor” contributing to his disability, the trial court necessarily found medical causation, “as the accident need not have been the sole cause, or the dominant cause, but merely a contributing cause of Gore’s permanent and total disability.” Gore cites Easterly v. Beaulieu of America, Inc., 703 So.2d 397 (Ala.Civ.App.1997), in support of his contention. In Easterly, this court held that the employee’s “discitis” was the result of treatment necessitated by a work-related injury and, therefore, was compen-sable under the workers’ compensation statutes. The holding in Easterly is not applicable to the issue in the present case.
“ ‘A trial court may infer medical causation. from circumstantial evidence indicating that, before the accident, the *749 worker was working normally with no disabling symptoms but that, immediately afterwards, those symptoms appeared and have persisted ever since. See Boise Cascade Corp. v. Jackson, 997 So.2d 1042, 1047 (Ala.Civ.App.2008) (citing Alamo v. PCH Hotels & Resorts, Inc., 987 So.2d 598, 603 (Ala.Civ.App. 2007) (Moore, J., concurring specially)).’ Waters Bros. Contractors, Inc. v. Wimberley, 20 So.3d 125, 134 (Ala.Civ.App.2009). See also Equity Group-Alabama Div. v. Harris, 55 So.3d 299, 311 (Ala.Civ.App.2010).”
McAbee Constr., Inc. v. Allday, 135 So.3d 968, 974 (Ala.Civ.App.2013).
We agree with Gore’s conclusion that, in explicitly finding that Gore “suffered a permanent partial disability as a result of the accident,” the trial court concluded that Gore had proven medical causation. It is the extent to which Gore’s disability can be attributed to the accident that is at issue. Gore asserts that he had not suffered a neck injury before the accident; therefore, he appears to say, the trial court was required to attribute all of his neck complaints to the injury he sustained in the accident.
However, this is not a case in which Gore’s preexisting neck condition was latent or asymptomatic before the accident. Opinions of this court have affirmed judgments in which trial courts have denied compensation to employees who, before their on-the-job accidents, displayed symptoms consistent with those of which they complained after their accidents. For example, in Proctor v. R.R. Dawson Bridge Co., 757 So.2d 446 (Ala.Civ.App.1999), Clarence Proctor worked as a welder for R.R. Dawson Bridge Company. On June 24,1997, while welding for Dawson Bridge, Proctor began suffering from the symptoms of heat exhaustion, including dizziness, weakness, headaches, nausea, cramps, chest pains, heavy breathing, and sweating. Although he returned to work the next day, Proctor again began to suffer from the symptoms of heat exhaustion and had to leave work early.
On June 26, 1997, Proctor went to see his family physician, Dr. Ivana Kajdos, who diagnosed him with heat exhaustion. On July 30,1997, Dr. Kajdos wrote a letter in which she stated that Proctor could not tolerate extreme heat coupled with physical exertion without facing a significant health risk. She opined that Proctor was “ ‘totally unable to keep a regular job within his capacity.’ ” Id. at 447. On September 4, 1997, Dr. Kajdos wrote a second letter expressing her belief that Proctor was “ ‘totally disabled at this point to keep any regular job.’ ” Id.
Proctor sued Dawson Bridge for workers’ compensation benefits, claiming that the heat exhaustion is what triggered his inability to work. Dr. Kajdos testified that Proctor had emphysema, atherosclerosis, and high blood pressure before the episodes of heat exhaustion but that those episodes served as a “trigger” event that started Proctor’s physical decline. Id. at 448. Proctor testified that, before the episodes of heat exhaustion, he was not aware that he had emphysema and had never been treated for that condition.
Dawson Bridge, however, presented evidence indicating that Proctor had, in fact, experienced similar symptoms before the June 1997 episodes. Dr. Kajdos testified that Proctor had emphysema when she first began seeing him as a patient in December 1995 — a year and a half before the episodes of heat exhaustion began. Additionally, two of Proctor’s coworkers testified that, even before suffering from heat exhaustion in June 1997, Proctor had complained of nausea and stomachaches, had taken frequent breaks, had coughed *750 and wheezed, and had sweated even in cooler months. Id.
This court noted that
“Dr. Kajdos admitted that her opinion that the episodes of heat exhaustion in June 1997 triggered the employee’s present disabled condition is based upon the employee’s assertion that his symptoms did not appear until the episodes of heat exhaustion in June 1997. Dr. Kaj-dos conceded that if the symptoms experienced by the employee were present before the episodes of heat exhaustion, then she would need to search for other causes for the employee’s present complaints.”
Id. at 448-49. In light of that evidence, this court concluded that the trial court’s judgment that Proctor had jnot sustained a compensable injury was supported by substantial evidence. Id. at 449. See also Wright v. Dorsey Trailers, Inc., 611 So.2d 1098 (Ala.Civ.App.1992) (employee who alleged that a foot injury was the primary cause of his inability to work was denied compensation because he had received medical attention for foot ailment two months before the accident).
In this case, the evidence indicates that, before the accident, Gore was not working normally with no disabling symptoms. The facts in this case are at least as indicative that Gore’s neck problems were caused by a preexisting condition in his neck as the facts in Proctor indicating that Proctor had suffered from emphysema before the episodes of heat exhaustion. Here, Archer, Gore’s supervisor at La-farge, testified that, before the accident, Gore frequently was unable to work because of neck, back, and shoulder pain. Archer stated that Gore’s absences from work with such complaints were “excessive.” Gore’s medical records tend to corroborate Archer’s statement, indicating that, about two weeks before the accident, Gore sought treatment from Dr. Howard for pain radiating from his neck. Gore was taking narcotic pain relievers in the days leading up to the accident. Like Dr. Kajdos in Proctor, Dr. Maher in this case testified that he based his opinion that the onset of Gore’s neck problems coincided with the accident on the history Gore had provided to him. Dr. Maher also acknowledged that, based on information he learned during his deposition, it appeared that Gore was not always forthcoming with his doctors. The trial court explicitly found that Gore’s credibility had been impeached through his conviction for “doctor shopping,” his inconsistent testimony, and his “plain misrepresentations to his treating physicians.” Based on the record before us, we conclude that substantial evidence supports the trial court’s conclusion that, at the time of the accident, Gore suffered from a preexisting neck condition that often prevented him from being able to do his job for Lafarge.
Gore contends that the trial court’s finding that he was not permanently and totally disabled and had sustained a permanent partial disability of only 10% as a result of the injuries he received in the accident was not supported by substantial evidence. Gore also asserts that, in reaching its decision, the trial court ignored undisputed evidence, including the facts that he was awarded Social Security disability benefits; that his treating physician was of the opinion that Gore could not work; that, at the time of trial, he was participating in a pain-management program and was still taking pain medications that prevented him from driving; and that his depression had become worse. However, disability alone does not prove causation. McCutcheon v. Champion Int'l Corp., 623 So.2d 742 (Ala.Civ.App.1993).
*751 Neither Lafarge nor the trial court disputed that Gore is unable to work. Lafarge’s position throughout this litigation has been that Gore’s neck condition preexisted the accident and that, therefore, his inability to work now is not the result of that accident. As our supreme court has stated, “an employer is not the absolute insurer of an employee’s health and should bear only the costs of compensating employees for accidents that arise out of and in the course of their employment.” Ex parte Trinity Indus., Inc., 680 So.2d 262, 265 (Ala.1996) (footnote omitted). Based on the authority of Proctor, supra, and Wright, supra, the trial court could have determined that Gore’s preexisting condition prevented Gore from being able to work and denied him any workers’ compensation benefits at all. Instead, however, it determined that Gore had a 10% disability that was attributable to the injuries he sustained in the accident. We note that Lafarge did not cross-appeal to challenge that finding.
“The trial court is free to choose which evidence it believes, and when conflicting evidence is presented, the findings of the trial court, which has the duty to resolve the conflicts, are conclusive, if supported by the evidence. Acustar, Inc. v. Staples, 598 So.2d 948 (Ala.Civ.App.1992); Seifert v. Houlditch, 583 So.2d 274 (Ala.Civ.App.1991). The trial court is not bound by expert opinions in workers’ compensation cases, even if those opinions are uncontroverted. The trial court is free to consider all of the evidence, ‘as well as its own observations of the witnesses. The trial court may then interpret what it has heard and observed, according to its own best judgment.’ Gibson v. Southern Stone Co., 518 So.2d 730, 731 (Ala.Civ.App. 1987); see also Armstrong v. Lewis & Associates Construction Co., 469 So.2d 605 (Ala.Civ.App.1984). It is the trial court’s duty to determine the extent or percentage of disability based on all the evidence before it and its own observations. Genpak Corp. v. Gibson, 534 So.2d 312 (Ala.Civ.App.1988).”
Reed v. James R. Fincher Timber Co., 659 So.2d 660, 663 (Ala.Civ.App.1995); see also Fontaine Trailer Co. v. Hurt, 607 So.2d 265, 267 (Ala.Civ.App.1992) (“In determining the extent of disability, it is the duty of the trial court to review all the evidence and to make its own observations.”).
As mentioned, in its judgment, the trial court expressly found that Gore had failed to prove that he was permanently and totally disabled as a result of injuries he received in the accident. The trial court found that Gore’s testimony had been impeached, and it obviously did not believe Gore’s assertion that he had not had problems with his neck before the accident. The trial court also found that Dr. Maher’s determination that Gore had a 20% impairment to the body as a whole encompassed injuries suffered throughout Gore’s life, i.e., it included injuries other than those Gore had sustained in the accident. Gore also suffered from degenerative and congenital ailments in his neck, and he had an “excessive” number of absences from work based on complaints that he was unable to work because of neck, back, and shoulder pain. Before the accident, Gore had a history of use of narcotic pain relievers, and, in fact, he was taking narcotic pain relievers in the days leading up to the accident. Dr. Maher testified that, when he first saw him, Gore had arthritis at almost every level of his spine, and that it was worst in his neck. “Standing alone,” the trial court found, the injuries sustained in the accident were “not the cause” of Gore’s inability to work. Nonetheless, the trial court found that the accident resulted in a permanent partial disability of 10%.
*752 Based on the record before us, we conclude that substantial evidence supports the trial court’s finding that the injuries Gore suffered in the accident did not render him permanently and totally disabled. Because Lafarge did not challenge that finding, we conclude that the 10% permanent-partial-disability rating is due to be affirmed.
Finally, Gore contends that the final judgment is “defective,” and therefore, he says, this case must be remanded. Specifically, he argues that, because he never returned to work, the trial court was required to determine his loss of ability to earn. Gore cites Lipscomb v. City of Gadsden, 794 So.2d 395 (Ala.Civ.App.2000), in support of his contention.
In Lipscomb, the case relied on by Gore, this court quoted Washington v. Tyson Foods, Inc., 659 So.2d 670, 670-71 (Ala.Civ.App.1995):
“‘This court has previously held that, in order to award workmen’s compensation benefits, a trial court must determine that the employee has suffered a loss of ability to earn as a result of an on-the-job injury and that the percentage of bodily impairment cannot be the basis for awarding compensation.’ ”
794 So.2d at 398.
Furthermore § 25-5-57(a)(3)g., Ala. Code 1975, provides that for all cases involving permanent partial disabilities that are not scheduled-member injuries, “compensation shall be 66 2/3 percent of the difference between the average weekly earnings of the worker at the time of the injury and the average weekly earnings he or she is able to earn in his or her partially disabled condition.... ” (Emphasis added.)
Here, Gore’s injury falls outside of the schedule. Therefore, we reverse the judgment of the trial court and remand the cause for a determination of whether Gore has suffered any loss of ability to earn as a result of the injury he sustained in the accident. Regarding the determination of compensation based on the employee’s loss of ability to earn, Judge Terry Moore has written:
“Obviously, if the employee can perform the full range of work as before the injury, the employee may continue to earn the same amount of wages with no loss of earning capacity. Likewise, if the employee is restricted from performing physical or mental functions which the employee would never use for profit anyway, the court would be justified in denying compensation for loss of earning capacity. For example, a bookkeeper who has lost the ability to lift heavy weights should still be able to perform the essential functions of bookkeeping without loss of wages, while that same restriction may devastate a construction worker or manual laborer. Thus, it is essential that the court isolate the injured employee’s pre-injury earning ability before making a determination of the effect of the injury on that earning capacity.”
1 Terry A. Moore, Alabama Workers’ Compensation § 13:22 (1998) (footnote omitted).
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN and DONALDSON, JJ., concur.
THOMAS and MOORE, JJ., concur in the result, without writings.