On Application for Rehearing
This court's opinion of December 17, 2004, is withdrawn, and the following is substituted therefor.
Earnestine Crump sued her employer, Fort James Operating Company d/b/a Georgia Pacific ("Fort James"), on December 7, 1999, seeking to recover workers' compensation benefits for an injury she allegedly sustained to her lower back on March 25, 1998, while lifting a roll of plastic during the course of her employment with Fort James. Fort James answered Crump's complaint on January 7, 2000. On June 7, 2000, Crump testified in her deposition that she also injured her back on November 5, 1998. On January 2, 2001, Fort James amended its answer, admitting that Crump had pulled a muscle in her back during the course of her employment on March 25, 1998, and alleging, among other things, that any claim pertaining to a work-related injury occurring on any date other than March 25, 1998, i.e., the alleged injury she testified to in her deposition as occurring on November 5, 1998, was barred by the applicable statute of limitations.
On June 5, 2001, Crump amended her complaint to allege that she had suffered an injury to her back on November 5, 1998, while lifting a roll of plastic during the course of her employment with Fort James. On June 15, 2001, Fort James moved to strike the amended complaint, arguing that the claim asserted for the alleged injury suffered on November 5, 1998, was barred by the applicable statute of limitations. The trial court entered an order on September 10, 2001, denying Fort James's motion to strike the amended complaint. Thereafter, Fort James answered the amended complaint, again raising the defense of the statute of limitations.
On January 28, 2002, Fort James moved the trial court for a summary judgment, again arguing that the claim in the amended complaint alleging an injury on November 5, 1998, was barred by the applicable statute of limitations. The trial court denied Fort James's motion on February 19, 2002. Following an ore tenus proceeding, the trial court, on August 30, 2002, entered an order finding Crump 100% permanently and totally disabled and awarded benefits accordingly. On September 27, 2002, Fort James moved the court to vacate and/or amend its judgment or for a new trial. The trial court, on December 23, 2002, entered an order amending its judgment of August 30, 2002. Fort James appeals.
This case is governed by the 1992 Workers' Compensation Act, § 25-5-1 et seq., Ala. Code 1975. That Act provides that an appellate court's review of the standard of proof and its consideration of other legal issues in a workers' compensation action *Page 1055 
shall be without a presumption of correctness. §25-5-81(e)(1), Ala. Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our supreme court "has defined the term `substantial evidence,' as it is used in § 12-21-12(d), [Ala. Code 1975,] to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus.,Inc., 680 So.2d 262, 268 (Ala. 1996), quoting West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989). This court has also concluded: "The [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v.Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App. 1995).
 I. Facts
At the time of trial, Crump was 55 years old. Crump had been employed by Fort James for approximately 25 years and was working as a "wrapper operator" at the time of the incidents giving rise to this action.
A "wrapper" machine wraps toilet tissue into four-roll packs. She stated that her primary job duties as a "wrapper operator" included observing the machine to ensure that the toilet tissue was being properly wrapped and placing the rolls of "wrap" into the machine. She stated that the "wrap" had to be placed into the machine three to four times per shift and that this task required heavy lifting because the "wrap" had to be lifted from a pallet to the machine. Crump stated that the rolls of "wrap" are stacked three high on the pallets and that one more or less has to "manhandle" the rolls onto the wrapping machine. She testified that on the "graveyard" shift she was also required to clean her work area, which involved bending and pulling on an air hose in order to clean underneath the wrapper machine. She also testified that her job duties included monitoring the "packing" machine and clearing jams that occurred in that machine. She stated that clearing the jams on the packing machine was a strenuous task.
Crump testified at trial that she injured her back on March 25, 1998, while lifting a roll of "wrap" from a pallet onto the wrapping machine. Crump testified that she felt a "pull" in her back with pain radiating into both of her legs, "more or less in the right [leg]."[1]
Crump reported her back injury to Fort James's first-aid station. She informed the nurse on duty that her back started hurting when she lifted a roll of "wrap." Crump testified that she told the nurse that her back had started hurting, but she did not tell him of any symptoms in either of her legs. The nurse provided Crump with a "cold-pack" and some pain medication.
Crump had a scheduled day off on March 26, 1998. On March 27, 1998, she called into the first-aid station to again report that her back was hurting. She did not complain of any pain radiating into her legs at that time. Crump's back injury *Page 1056 
was reported to Steven Griffith, a supervisor, and she was referred to an authorized treating physician, Dr. Kent Darsey.
Crump was seen by Dr. Darsey on March 28, 1998. Crump informed Dr. Darsey that she had pulled her back at work and that she continued to suffer from lower-back pain. Dr. Darsey's records indicate that Crump denied any radiculopathy[2] or numbness in her legs at that time. However, Crump testified at trial that she did inform Dr. Darsey that she had pain radiating into her right leg. Dr. Darsey performed a straight-leg raise test that was negative for pain, and he further found Crump's motor and sensory functions intact. The examination revealed that Crump was not experiencing any signs of a herniated disc with nerve-root involvement. Dr. Darsey diagnosed Crump with an acute lumbar-sacral strain and prescribed moist heat as well as some medication. Dr. Darsey returned Crump to work with a lifting restriction of 40 pounds and a restriction of no prolonged walking or standing.
Crump returned to work on March 29, 1998, and she completed an "incident investigation report." She stated in the report that as she was "removing wrap from skid, lower back started hurting." Crump testified that she did not report any pain radiating into her legs at the time the report was completed; however, she reiterated at trial that she did experience leg pain at the time she injured her back. When asked at trial why she omitted her complaints of leg pain from the report, Crump replied "I just didn't put that."
Crump was seen by Dr. Terry M. French, a partner of Dr. Darsey's, on March 31, 1998. Crump informed Dr. French that her condition had improved by 50% to 60% but that she still experienced pain in her back with prolonged standing and lifting and pulling. She also complained of pain radiating into her right thigh. Crump told Dr. French, however, that she had experienced pain and swelling in her right thigh before the March 25, 1998, workplace accident. The record indicates that since at least 1995, Crump had experienced swelling in her right leg along with pain shooting into her back. Crump informed Dr. French that it was difficult for her to determine whether the right leg pain was new or old. She testified at trial, however, that her work-related injury did not cause her right-thigh symptoms. Dr. French noted some chronic degenerative joint disease of the right leg. He performed a straight-leg raise test, which was positive on the right side and negative on the left side. He also found a normal neurological exam. Dr. French diagnosed Crump with "resolving low back strain."
Dr. French testified that a person can herniate a disc without causing impingement on a nerve root and resulting radiculopathy. Dr. French stated that a herniated disc on the left side would refer pain down the left side of the body and that a herniated disc on the right side would refer pain down the right side of the body. He stated that Crump's negative Straight-leg raise test on the left side was indicative of the absence of a herniated disc at the L4-L5 level on the left side. He further stated that Crump's complaint of right-leg pain at that time was not related to a herniated disc at the L4-L5 level on the left side. Regarding Crump's admission that her condition had improved 50% to 60%, Dr. French stated that such fast improvement is not indicative of a herniated disc. He stated that with a herniated disc the pain would worsen with time and that the referral of pain down the lower extremities would become more definitive. *Page 1057 
Crump returned to Dr. French on April 3, 1998. She told Dr. French that she was much improved with an overall improvement of 50% to 60%. She no longer reported pain radiating into the right thigh; however, she continued to report some pain with certain lifting and bending. Dr. French noted some tenderness over the lower thoracic upper lumbar region that was worse on the right side. Crump had a negative straight-leg raise test and a normal neurological exam. Dr. French stated that Crump's improvement was not indicative of a nerve-root compression associated with a herniated disc. He stated that at no time did Crump complain of left-side radicular pain. Dr. French released Crump to return to her regular work duties at that time.
Crump returned to her regular duties at Fort James after her release from Dr. French. She testified that although she experienced pain in her back that radiated down both legs, she was able to fully perform the functions of her job with only occasional assistance. She returned to Dr. French on April 13, 1998, and he noted at that time that Crump stated that she was 90% improved and that she was able to perform her regular job duties "with no problem." Crump complained of occasional stiffness and "twinging" in her back that rapidly resolved. Dr. French noted that she had a negative straight-leg raise test and a negative neurological exam. Dr. French's diagnosis continued to be "resolving low back strain." Dr. French stated that he had no indication based on Crump's history or examinations that she had a herniated disc with nerve-root compression. He stated that the "March . . . injury was completely not compatible with a nerve root injury." Dr. French released Crump from his care with instructions to return to him if she experienced any further problems. He did not assign Crump an impairment rating.
Crump worked full-time between April 13, 1998, and November 5, 1998. She also worked overtime during this period, including a total of 64 hours during the week of August 17, 1998, 64 hours during the week of September 6, 1998, and 57 hours during the week of October 18, 1998. Between April 13, 1998, and November 5, 1998, Crump at no time was absent from work because of any back or leg problems. She visited five personal physicians on over a half-dozen different occasions between April 13, 1998, and November 5, 1998; however, at no time did she complain of any back or leg pain. Additionally, Crump visited the first-aid station at Fort James on five occasions between April 13, 1998, and November 5, 1998, and did not complain of any back or leg pain. She never reported to any of her supervisors that she was experiencing any back or leg pain.
Crump testified, however, that she experienced several "flare-ups" of her back and leg pain between April 13, 1998, and November 5, 1998, after lifting rolls of "wrap" while at work. She stated that she did not report any of those "flare-ups" because "with rest and taking care of her back [she] would sort of get over them." Crump testified that she continued to perform her job because she had to work and that she performed her job the best that she could while in pain.
Crump testified that on November 5, 1998, she felt a "pull" in her back when she lifted a roll of "wrap" at work. She stated that the pain she experienced after this incident was the same as the pain she had experienced after the March 25, 1998, incident. She finished her shift and did not report the incident to management and did not seek treatment from the first-aid station, because, she said, she believed that the pain she was experiencing was similar *Page 1058 
to the other "flare-ups" and that if she went home and went to bed the pain would "go away."
Crump was not scheduled to work on November 6, 1998. On November 7, 1998, she telephoned the guard office at Fort James to report that she would be unable to work her scheduled shift that day because she had "pulled a muscle or something in [her] back" and that she was going "to the doctor because [she could] hardly walk." On direct examination, Crump testified that she told the security guard that she had hurt her back "at work." On cross-examination, when confronted with a transcript of her conversation, she conceded that she had not told the security guard she hurt her back "at work."
Crump was seen by Dr. Robert Eaton in the emergency room on November 7, 1998. The emergency-room record indicates that Crump complained of "low back pain that radiates to her left leg posteriorly" and that "the pain started yesterday." At her deposition, Crump did not dispute that she gave the emergency-room staff the above-stated history; however, she testified at trial that she informed the emergency-room staff that she injured her back at work on November 5, 1998.
Dr. Eaton's physical exam revealed tenderness in the lumbro-sacral area with pain radiating down the left leg. Crump had a positive straight-leg raise test on the left side. Dr. Eaton's impression was that Crump had a lumbro-sacral strain. He prescribed pain medication and restricted Crump to no lifting, pulling, or pushing for several days.
On November 11, 1998, Crump informed Fort James that she was unable to work her scheduled shift because of her back problems. On that same day she was seen by Dr. Tammy Henderson, Crump's personal physician. Crump complained of low-back pain that radiated into her left leg. Dr. Henderson stated that Crump reported that the pain "just started and it just got worse and worse." Dr. Henderson also stated that Crump informed her that the symptoms began either the day before she went to the emergency room (November 6, 1998) or the day she visited the emergency room (November 7, 1998). Dr. Henderson took Crump off of work for one week.
Crump returned to Dr. Henderson on November 20, 1998, with continued complaints of low-back pain that radiated into her left leg. Dr. Henderson ordered an MRI, which revealed a large herniated disc at the L4-L5 level on the left side. Dr. Henderson informed Crump on December 16, 1998, that she was going to refer Crump for a neurosurgery consultation and that Crump most likely would have to undergo surgery to repair the herniated disc. Crump did not return to her employment at Fort James after this date. Dr. Henderson referred Crump to Dr. R. Hunt Bobo, a neurosurgeon.
After being told that she would probably need surgery, Crump reported her back condition to Fort James as a work-related injury and attempted to collect workers' compensation benefits. Crump's workers' compensation claim was rejected by Fort James because of the "gap of time" between the March 25, 1998, accident and the onset of symptoms in November 1998. Crump testified that at that point she simply sought treatment on her own through her medical insurer.
On December 28, 1998, Crump applied for short-term disability benefits through Fort James's benefit program. Fort James fully funds the short-term disability benefits program and Aetna U.S. Health-care administers the program. Crump received a total of $11,295 in short-term disability benefits over a 36-week period, *Page 1059 
which is the maximum number of weeks one may receive the benefits.
Crump was first seen by Dr. Bobo on December 31, 1998. Crump related a history to Dr. Bobo of experiencing back pain after injuring herself approximately five months[3] earlier while lifting a roll of plastic at work. Crump told Dr. Bobo that her back pain had become more severe and had started radiating into her left leg and hip approximately one month before the date of her visit to him.[4] Dr. Bobo stated that Crump related the left leg and hip pain to the injury she had suffered five months earlier while lifting a roll of plastic at work. Dr. Bobo reviewed the MRI ordered by Dr. Henderson and noted that it revealed a "large free fragment at the L4/5 over the left side of the L5 vertebral body in the canal." Dr. Bobo recommended surgery to repair the disc.
On January 27, 1999, Dr. Bobo performed a surgical discectomy at the L4-L5 level on the left side. During surgery, Dr. Bobo found a firm fibrous disc fragment at the L5 nerve root on the left side. Dr. Bobo explained that the existence of a firm fibrous herniated disc is indicative of the "healing process" and of a herniated disc "that has been there a little bit longer than something that just happened in the last few weeks and is fresh and peels right out." Dr. Bobo testified that Crump's workplace injury suffered on March 25, 1998, contributed significantly to the herniated disc he surgically repaired in January 1999. He stated that the timing of the March 25, 1998, injury and his pathological findings were consistent with Crump having herniated the disc on March 25, 1998.
Dr. Bobo also testified that a herniated disc can be asymptomatic, causing only back pain but no radiculopathy. He stated that it is likely that a herniated disc that is asymptomatic will remain asymptomatic absent some subsequent trauma. He stated that the need for surgery only arises when the herniated disc impinges on a nerve root and causes radiculopathy. Dr. Bobo testified that based on Crump's medical records she did not display any signs of radiculopathy after the March 25, 1998, lifting incident at work and that she first displayed signs of radiculopathy after the November 5, 1998, lifting incident at work. Dr. Bobo opined that Crump herniated the disc on March 25, 1998, but had a "good recovery" from that injury, only to "herniate out some more disc acutely" on November 5, 1998, impinging the nerve and causing the radiculopathy.[5] Dr. Bobo testified as follows:
 "Q. At the end of the day, Doctor, what is your opinion of the most likely scenario on this causation?
 "A. I think she had a herniated disc out in March, wasn't causing radiculopathy, and went on and herniated more disc in November that did cause a radiculopathy.
 "Q. Okay. Necessitating surgery? *Page 1060 
 "A. Yes."
Dr. French reviewed Crump's medical records regarding her symptoms after the November 5, 1998, injury, and he testified that those symptoms were related to the left side, whereas the symptoms Crump complained of after the March 25, 1998, injury were limited to the right side. He stated that because the symptoms complained of were on the opposite side, the November 5, 1998, injury was not related to the March 25, 1998, injury. Dr. French did testify that it was possible that the March 25, 1998, accident caused the disc to herniate without causing it to impinge upon the nerve and that then, in the November 5, 1998, accident, "something further occurred" that caused additional disc material to protrude and impinge upon the nerve. He stated, however, that this scenario was very unlikely.
Dr. Henderson testified that the March 25, 1998, accident suffered by Crump probably resulted in a protruding disc that was not impinging upon a nerve and that the November 5, 1998, accident was the "final inciting event" that resulted in the disc impingement upon the nerve that required surgery. She stated that the November 5, 1998, injury was probably a worsening of an already present condition. Dr. Henderson specifically testified as follows:
 "Q. . . . [W]ould it be your opinion that she ruptured her disc on March 25, 1998, and caused it to be worsened in the instance of November 5, 1998?
 ". . . .
 "A. It's possible.
 "Q. Is it more probable than not that that occurred in your opinion?
 "A. I can't say that the March injury was when the disc initially ruptured. I do believe that in November that an already bad disc was made worse by her injury. She says it's at work and I've never known her to lie to me, and I believe her, and I would think that the ensuing nerve impingement and surgery stemmed from whatever happened in November, whether the March incident was initial or just by the way.
 ". . . .
 "Q. Now, discs can rupture without there being ensuing nerve root pressure, can't it?
 "A. Yes.
 "Q. In other words, the disc can rupture and bulge out to a point where it just doesn't quite get up against the nerve?
 "A. Correct.
 "Q. Then another traumatic event can be superimposed on that condition and cause it to go on out where it presses against the nerve?
 "A. Yes.
 "Q. Okay. Now, is it more probable than not in your opinion, based on what you've earlier said, that that's what happened in this case?
 "A. Yes.
 "Q. That on March 25, 1998, she had a partial rupture, but without nerve root impingement, and then in November —
 "A. Probably.
 "Q. Probable. And then in November of 1998, it finished rupturing and got on out against a nerve root?
 "A. Yes."
Dr. Henderson, like Dr. Bobo, stated that a herniated disc that was asymptomatic could remain asymptomatic absent subsequent trauma.
Crump was referred by her counsel to Dr. Robert F. Allen, a neurologist, for further evaluation. Dr. Allen testified in his deposition that he evaluated Crump on September 4, 2001, and that the evaluation included a physical examination, a neurological examination, and nerve and muscle *Page 1061 
EMG testing. Dr. Allen found Crump to have diminished strength in her extensor hallucis longus muscle in the left leg and diminished sensation in both legs, which was worse on the left. He also found that Crump had diminished reflexes in her left leg. Dr. Allen stated that Crump's decreased muscle strength, sensation, and reflexes were related to nerve-root impingement. Dr. Allen stated that the EMG studies indicated widespread denervation in the left leg at the L4, L5, and S1 levels. He stated that denervation is indicative of a pinched nerve or of nerve damage. Dr. Allen stated that the worst dysfunction was located at the L5 level on the left, which was the site of the surgical finding by Dr. Bobo of the firm fibrous disc fragment that was compressing the L5 nerve root.
Upon questioning on direct examination by Crump's counsel, Dr. Allen opined that Crump had suffered a large herniated disc at the L4-L5 level on March 25, 1998, which resulted in the compression of the L5 nerve root on the left side. He further stated that because multiple disc fragments were found at the time of surgery, it was probable that Crump suffered compressions of the L4 and S1 nerve roots that are located directly adjacent to the L5 nerve root. Dr. Allen further testified that Crump's L5 nerve root on the right side was at least temporarily compressed and most likely suffered some injury at the time of the March 25, 1998, accident and that, as the disc subsequently fragmented, the majority, or even all of those disc fragments, came to lie on the left side of the spine. Dr. Allen testified that Crump had suffered a disc herniation on March 25, 1998, which initially caused symptoms in her back, then in her right leg, and ultimately in her left leg. He stated that in his opinion Crump has suffered permanent nerve injury to the left L5 nerve root and to some degree has suffered permanent injury to the left L4 and S1 nerve roots.
On cross-examination by counsel for Fort James, however, Dr. Allen testified that Crump had failed to inform him of the alleged work-related accident and injury occurring on November 5, 1998, and that he was otherwise unaware of such an accident and injury. Dr. Allen further testified that Crump had told him that from April 1998 she continuously had back pain that radiated into her left leg. However, Dr. Allen stated that that history was completely inconsistent with the emergency-room record of November 7, 1998, which, as mentioned above, indicates that Crump complained of "low back pain that radiates to her left leg posteriorly" and that "the pain started yesterday." After being made aware of the alleged November 5, 1998, accident and injury, Dr. Allen opined as follows:
 "Q. Doesn't that sound like, in March, she had a temporary muscle strain, and then in November, she herniated the disc in her lower back?
 "A. That would be one possibility, yes.
 "Q. That's the most probable thing, isn't it?
 "A. That's one possibility. Another possibility, of course, would be that she actually suffered disruption of the disc on March 25th, `98, which was symptomatic for a period of several months, with exacerbations of back pain from time to time. And, then a more symptomatic fragmentation herniation of the disc on or about November 5th, 1998, in the same disc that had been weakened from the earlier accident of March 25, `98. That would be an equally plausible explanation. Sitting here three years later, if all those facts are correct, I would not have a way to document which *Page 1062 
of those particular scenarios was, in fact, the truth.
 "Q. So, it's a fifty-fifty shot? One's not more likely than the other?
 "A. I would say one is not more likely than the other.
 ". . . .
 "When a disc is injured, it can pardon, it can form some what's called fibrosis, which means scarring, and certainly that would be a plausible explanation of why she was able to keep going for several months before this disc fragmented. And, in fact, when Doctor Bobo took a direct-eye view of the disc fragments that he removed, he found a firm fibrous herniated disc. So, it looks to me, at least from my understanding of disc pathology, that this was a scarred disc. So, it would seem to me that this fibrous of the disc would show an earlier injury and a subsequent fragmentation.
 "But, you, know, I don't have a way to prove that beyond a shadow of a doubt. But, based upon a reasonable degree of medical certainty, I would say that it's more likely than not that this lady had suffered significant disc injury some time before the surgical date, probably months before, that led to fibrosis of the disc. And, then a subsequent multiple fragmentation. There may not have been a single date of fragmentation. She could have been spewing little fragments off of this disc over a several month period. And, that may well explain why she had bouts of back pain throughout this time.
 ". . . .
 "So, my thought would be that, in all likelihood, she did have disc injury sufficient to cause scarring of the disc on or about 3-25-98. And, then, more than likely, several episodes of disc fragmentation, and then at some point in time, perhaps on November the 5th, '98, and perhaps at another time, she suffered a large fragment that actually compressed the left L5 nerve root. But, there were multiple fragments found at surgery. And, I think there's no disputing that fact, because that was a hands-on view of the surgeon. But, that fragmentation may have occurred as one event or may have occurred as a series of events. There's no way for me or the surgeon to know when that occurred.
 ". . . .
 "Q. So, under the simple fact that she had a fibrous herniated disc, that doesn't eliminate the possibility that she herniated the disc on November the 5th, instead of March 25th?
 "A. It doesn't eliminate the possibility. I believe that it's more likely that the actual injury to the disc that precipitated the fibrosis occurred before November. Whether or not the large fragment occurred in November, I don't know. Perhaps it did. I just don't have any way of knowing.
 "Q. And, we know that after March 25th, Ms. Crump was able to return to work, full duty.
 "A. I understand that she went back to work.
 "Q. But, subsequent to the November injury, she wasn't able to resume full duty and go back to work for more than a couple days, I believe she said.
 "A. I don't believe she ever went back to consistent work after that time.
 "Q. Wouldn't that lead you to believe that it was the November injury that caused her disability, and not the March injury?
 "A. I just don't know that they're separable, Mr. Moore. Had it not been for March, there may not have been a November. I just have no way of knowing. It seems more likely to me that she *Page 1063 suffered the initial disc injury on March 25th, and that whatever happened after that was an exacerbation, thereof.
 "Q. Let's assume that that's the case for this question. Wouldn't the exacerbation that occurred in November of 1998, be the reason that she's off work?
 "A. That would have been the cause of her vocational disability, yes. But, not necessarily the cause of her medical disability.
 "Q. Sure. A disc can herniate, and it can compress back in, like you said —
 "A. Right. It can realign, and it can remain that way for long periods of time. There have been cases documented where there's an acute disc herniation, a realignment of the disc, fibrosis that occurs that scars it and actually retains the disc in place. And, then during some subsequent activity, could be work, could be a sneeze, could be intercourse, could be a cough, could be a bowel movement, that some type of motion leaves that vulnerable disc to herniate laterally and compress the nerve root.
 ". . . .
 "But, I still believe that the event that prompted the work-up and the surgery was March of `98, and not November of `98. I can say to you that the vocational disability, by clear facts, resulted in November, 1998. But, I'm not nearly so convinced that the medical disability occurred then. I think the medical disability actually occurred earlier.
 "Q. . . . You believe she herniated her disc on March 25th, 1998, and that for a period of time after that, very shortly after, she had some pain radiating into her right thigh as a result of that herniated disc; is that correct?
 "A. That is correct. That's what I believe. And, by virtue of compression of the right L5 nerve root, perhaps the L4 nerve root, either which pass right by the L4-L5 disc.
 "Q. And, you believe that this herniated disc at some point after March 31st, must have realigned itself, because she didn't continue to have those same symptoms?
 "A. That's correct. . . .
 "Q. And, there are cases where people have realigned herniated discs that, after that period of light duty or whatever, bed rest, medication, or whatever, they resume their normal duties and they go for the rest of their life without having any back problems whatsoever.
 "A. That is true.
 "Q. But, in the case of Ms. Crump, it's your opinion that, as a result of this later incident of lifting activity that she was doing at work, she wasn't one of those lucky ones that kept right on going with no problems. Her herniated disc that had realigned, now became misaligned —
 "A. Actually fragmented. Not just misaligned, but actually fragmented, and several fragments of disc were found up in the canal and up against nerve roots. So, there were several pieces of disc. So, it was a sequence of events that may have led to fragmentation. If she were, indeed, back to work after April of 1998, and if, in fact, she were working, and bending, and lifting, fifty to seventy-five pounds, she may have spit little fragments off the disc frequently for several weeks to a few months before becoming symptomatic enough to require surgery, or symptomatic enough that the surgeon recommended surgery to her.
 "Q. But, it's equally true that it also could have been that she went for the next eight, nine months, however long it *Page 1064 
was, with no fragmentation, and then on this one time event, resulted in a multiple fragmentation of the herniated disc?
 "A. That is a real possibility, and one that I cannot — I can't differentiate between those two.
 "Q. And, we know that her left leg pain began the day after that November 5th, 1998, event, if you accept the medical records as being true; is that right?
 "A. If we accept the medical records as being true, then the symptomatic large fragment at the L5 on the left would have occurred in early November of 1998 — November the 5th.
 ". . . .
 "Q. Given the fact that Ms. Crump wasn't complaining to any doctors that she was seeing, wasn't going to first aid, out of the three scenarios that we just identified, isn't it the second scenario, that is where she herniated the disc, it realigned, and it stayed aligned until November the 5th, 1998, that that's the one that's most probable?
 "A. I think I've already testified I was fifty-fifty between a series of fragmentations over time versus one large fragment. I just don't have a way to discern between — I don't think that she had just a simple back strain without herniation in March, however.
 "Q. And, that's still your opinion today, one or the other, it's fifty-fifty?
 "A. Yes."
(Emphasis added.)
On November 13, 2000, Crump applied for disability-retirement benefits through the Pace Industry Union-Management Pension Fund. In her application, Crump described the nature of her disability as follows: "back surgery — Feb. 1999 as a result of on-the-job injury. Injury approx. 10/98." Crump testified that when she completed this application she was referring to the November 5, 1998, accident and injury. Additionally, Crump applied for disability benefits that were available to her through a financing plan entered into by Crump for the purchase of some furniture. In this claim for disability benefits, Crump indicated that the date of her disabling injury was November 1998.
As mentioned above, Crump filed an amended complaint on June 5, 2001. In it she alleged that she had suffered a separate work-related accident and injury on November 5, 1998.
Fort James argues that Crump's claim relating to the November 5, 1998, injury in the amended complaint filed on June 5, 2001, is barred by the applicable statute of limitations. Crump argued in the trial court, and now on appeal, that the injury incurred on November 5, 1998, was a recurrence of the injury sustained on March 25, 1998, and that the amended complaint relates back to the date of the filing of the original complaint.
 II. Analysis
Section 25-5-80, Ala. Code 1975, states, in part:
 "In case of a personal injury not involving cumulative physical stress, all claims for compensation under this article shall be forever barred unless within two years after the accident the parties shall have agreed upon the compensation payable under this article or unless within two years after the accident one of the parties shall have filed a verified complaint as provided in Section 25-5-88. . . . Where, however, payments of compensation, as distinguished from medical or vocational payments, have been made in any case, the period of limitation shall not begin to run until the time of making the last payment."
Crump's amended complaint filed on June 5, 2001, alleging a work-related accident *Page 1065 
and injury on November 5, 1998, was obviously filed well beyond a two-year statute-of-limitations period measured from November 5, 1998. Therefore, in order for the claim in the amended complaint relating to the November 5, 1998, injury to be considered timely, it must relate back to the date of the original complaint.
This court has stated:
 "The `commencement of [a workers' compensation] action within the time prescribed by the statute is an indispensable condition to the liability of the [employer] and to [the worker's] right to sue.'
 "After the complaint is filed, `[the] action shall proceed in accordance with and shall be governed by the same rules and statutes as govern civil actions.' Rule 15(c), Ala. R. Civ. P., provides:
 "`An amendment of a pleading relates back to the date of the original pleading when
 "`. . . .
 "`(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. . . .'
"Thus, for an amended complaint to relate back to the date of the original complaint, the claim stated in the amended complaint must have arisen from the same conduct, transaction, or occurrence set forth in the original complaint. `The relation-back doctrine of Rule 15(c) is objective, and its application, under prescribed circumstances, is nondiscretionary.'
"An amendment to a complaint, filed beyond the statutory limitations period, that alleges facts not alleged in the original complaint or that attempts to state a cause of action that was not stated in the original complaint, is time-barred. The Supreme Court of Alabama stated the test for determining whether an amendment states a new cause of action, and thus cannot relate back to the date of the original complaint, as follows:
 "`"A new cause of action is not set up by amendment where the same substantial facts are pleaded merely in a different form, so that a recovery on either count of the complaint would bar a recovery on the other. As long as the plaintiff adheres to the contract or the injury originally declared upon, an alteration of the modes in which the defendant has broken the contract or caused the injury is not an introduction of a new cause of action. The test is whether the proposed amendment is a different matter, another subject of controversy, or the same matter more fully or differently laid to meet the possible scope of the testimony."'"
Gulf States Steel, Inc. v. White, 742 So.2d 1264,1267 (Ala.Civ.App. 1999) (emphasis added) (citations omitted).
Accordingly, the question before us becomes whether Crump's amended complaint "more fully or differently laid" out "the injury originally declared upon" — i.e., was Crump's post-November 5, 1998, worsened condition merely a result of a recurrence of her March 23, 1998, injury — or did Crump's amended complaint allege a new injury, or at least an aggravation of the March 23 injury, for which a new two-year statute-of-limitations period began to run on November 5, 1998.
The evidence presented indicates that on March 25, 1998, Crump suffered an injury to her lower back while lifting a roll of "wrap" at work. There was some evidence indicating that for a short period of time this injury resulted in some pain radiating into Crump's right leg; however, there is *Page 1066 
other evidence indicating that Crump had a preexisting problem with her right leg and that the pain radiating into her right leg may not have been the result of the March 23, 1998, injury. In any event, Crump recovered sufficiently from her March 25, 1998, injury that she returned to full-time employment at Fort James, and even worked significant overtime, until November 5, 1998. On November 5, 1998, however, Crump, while lifting a roll of "wrap" at work, experienced pain in her back, which radiated into her left leg.
Applying applicable legal principles to the allegations in the amended complaint; the extrajudicial statements, both written and oral, made by Crump; Crump's deposition and trial testimony; and the testimony and other medical evidence received from the various physicians in this case, including Dr. Henderson, Dr. French, Dr. Bobo, and Dr. Allen, we conclude that Crump suffered an "injury" from an "accident" within the meaning of our Workers' Compensation Act on November 5, 1998. Specifically, Crump suffered either a new injury on that date or, at the least, an aggravation of an existing condition. See generally Ex parte Pike CountyComm'n, 740 So.2d 1080 (Ala. 1999).
The injury alleged in the June 2001 amended complaint is not, in the words of this court in Gulf States Steel, Inc. v.White, 742 So.2d at 1267 (quoting ALFA Mut. Ins. Co. v.Smith, 540 So.2d 691, 694 (Ala. 1988), quoting in turn other cases), the same "`injury originally declared upon.'" Dr. Bobo opined that Crump herniated the disc in question on March 25, 1998, but that she had a "good recovery" from that injury, only to "herniate out some more disc acutely" on November 5, 1998, impinging the nerve and causing the radiculopathy. Dr. French opined that the injury Crump suffered on November 5, 1998, was not related to the March 25, 1998, injury and that "something further occurred" that caused additional disc material to protrude and impinge upon the nerve on the latter date. Like Dr. Bobo, Dr. Henderson also was of the opinion that the March 25, 1998, accident may have resulted in a protruding disc, but that it was not one that impinged upon a nerve, and that the November 5, 1998, injury was probably a worsening of an already present condition. Dr. Henderson, like Dr. Bobo, explained that a herniated disc could be asymptomatic and could remain that way absent subsequent trauma. Dr. Allen also offered the opinion that Crump suffered a disc herniation on March 25, 1998; however, Dr. Allen testified that he was "50-50" between being of the opinion that a series of fragmentations over time leading up to November 5, 1998, caused the worsening of Crump's condition beginning on that date and being of the opinion that there was one large fragmentation of the disc on November 5, 1998. We do not find substantial evidence in any of this testimony, or in any of the nonmedical evidence in the record, to support the proposition that Crump's post-November 5, 1998, condition, if not the result of a new injury, was anything other than the result of an "aggravation" of a preexisting condition for purposes of the Workers' Compensation Act.
In the terminology of Rule 15, Ala. R. Civ. P., the June 5, 2001, amendment to Crump's complaint concerned a separate "occurrence" insofar as liability under the Workers' Compensation Act is concerned. Therefore, that amendment does not relate back to the date of the original complaint, and, therefore, it is untimely.[6] *Page 1067 
In reaching a contrary conclusion, it is possible that the trial court applied the so-called "direct and natural consequence rule." This rule applies when an employee suffers a compensable injury at work, and then sustains a subsequent injury outside the course of the employment, in order to make the subsequent injury compensable under the terms of the Workers' Compensation Act. See Ex parte Pike CountyComm'n, 740 So.2d 1080. Although Pike County holds that an injury occurring outside of the workplace may becompensable if it is a natural consequence of the workplace injury, Pike County does not stand for the proposition that the subsequent injury is not a separate injury, or accident, for purposes of the statute of limitations. Indeed, the converse is true. See Gulf States Steel, Inc.,742 So.2d at 1268 (discussing Erwin v. Harris,474 So.2d 1125 (Ala.Civ.App. 1985)).
As was true in Gulf States Steel, Inc. v. White, the employee in this case could have maintained separate actions to recover workers' compensation benefits for her first and second accidents. She elected not to do so, and she cannot revive her statutorily barred claim for the latter accident by amending her complaint to include, what is, at best, from the employee's perspective, an aggravation of the preexisting condition that has arisen from a separate accident. See Gulf States Steel, Inc., 742 So.2d at 1268. The trial court's judgment is therefore due to be reversed.
The trial court's judgment is also due to be reversed for a second reason. Because Crump experienced a separate November 5, 1998, "accident" and suffers from a separate "injury," or aggravation of a preexisting injury, for purposes of the Workers' Compensation Act, she was required under § 25-5-78, Ala. Code 1975, to give notice to the employer of that accident and injury within 90 days or be barred from any recovery therefor under the Act. We do not find substantial evidence in the record indicating that Crump provided any such notice, either oral or written, to Fort James within the 90-day period following the November 5, 1998, injury. Among other things, Crump did not within that 90-day period give any notice to Fort James that the surgery or other medical treatment she received within that 90-day period was necessitated by a work-related incident that occurred on November 5, 1998.
It is true that Crump informed a security guard in a telephone conversation on November 7, 1998, that she had hurt her back. That telephone conversation with the security guard did not suffice as the required notice to Fort James. See
Ala. Code 1975, § 25-5-79; Wal-Mart Stores, Inc. v.Elliott, 650 So.2d 906, 908 (Ala.Civ.App. 1994) ("Knowledge on the part of a supervisory or representative agent of the employer that a work-related injury has occurred will generally be imputed to the employer"; notice to "door-greeter" not sufficient); Sloss-Sheffield Steel Iron Co. v.Watts, 236 Ala. 636, 638, 184 So. 201, 202 (1938) (knowledge of individual "who seems to have had some direction or superintendence over the intestate" was sufficient). Further, Crump conceded that she did not tell the security guard that she hurt her back at work. Oral notice must make known to the employer not only the fact of the injury, but also that the injury occurred in the course of employment.Wal-Mart Stores, 650 So.2d at 908; Premdor Corp. v.Jones, 880 So.2d 1148 (Ala.Civ.App. 2003). "The *Page 1068 
fact that an employer is aware that an employee has pain or a medical problem is not, by itself, sufficient to charge the employer with actual knowledge." Russell Coal Co. v.Williams, 550 So.2d 1007, 1012 (Ala.Civ.App. 1989).
 III. Conclusion
We hold that Crump's amended complaint did not relate back to the date of the filing of her original complaint. In addition, it was not until June 7, 2000, a date well beyond the 90-day period prescribed for notice under § 25-5-78, that Crump gave actual notice to Fort James that she had suffered a further injury to her back "at work" on November 5, 1998. Accordingly, Crump's claim for additional compensation as a result of her November 5, 1998, accident is barred by the two-year statute of limitations and by the notice requirement of § 25-5-78. Further, because it was not until June 7, 2000, that Crump gave actual notice to Fort James that she had suffered a further injury to her back "at work" on November 5, 1998, any claims for medical benefits accruing before June 7, 2000, with respect to that injury also are barred.
The judgment of the trial court is reversed, and the cause is remanded for further proceedings, if necessary, and the entry of a judgment consistent with this opinion.
APPLICATION GRANTED; OPINION OF DECEMBER 17, 2004, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
CRAWLEY, P.J., and PITTMAN and MURDOCK, JJ., concur.
THOMPSON and BRYAN, JJ., concur in the result, without writing.
[1] At her deposition taken on June 7, 2000, Crump testified that at the time of the injury she immediately experienced low-back pain with pain radiating into her left leg. Crump explained the discrepancy in her testimony regarding which leg the pain radiated into by saying that the deposition transcript may have been transcribed incorrectly. She stated at trial that she was sure she had said that the pain had radiated into her right leg when questioned in her deposition.
[2] Radiculopathy refers to the radiation of pain into the lower extremities.
[3] When Crump refers to the work-related accident "five months earlier," we assume she is referring to the March 25, 1998, incident. Dr. Bobo stated that Crump's history was "vague" and that she took a "shot in the dark" as to the date of her onset of back pain.
[4] Dr. Bobo also testified that Crump may have told him that her pain had increased and had begun radiating into her left leg following a second incident at work in which she had lifted a roll of plastic approximately one month earlier, but he also stated that he had no recollection of being told that.
[5] In response to a series of questions propounded by counsel for Fort James, Dr. Bobo also stated the following in a letter:
 "I believe that this disc had been herniated for quite some time and that an incremental small further herniation of the material caused a radiculopathy to become symptomatic requiring surgery."
[6] We pretermit consideration of the issue, also raised by Fort James on appeal, whether the trial court erred by not finding that Crump was able to perform her job duties in a normal manner before the November 5, 1998, injury and, therefore, whether, as a matter of law, no preexisting condition was present. See Howe v. Choctaw Emergency Mgmt.Servs., 725 So.2d 978 (Ala.Civ.App. 1998).