33 So.3d 592 (2008)
HOKES BLUFF WELDING AND FABRICATION
v.
Christopher Neil COX.
2070253.
Court of Civil Appeals of Alabama.
October 31, 2008.
Certiorari Denied September 18, 2009.
Alabama Supreme Court 1080185.
*593 Steven T. McMeekin of Wainwright, Pope & McMeekin, P.C., Birmingham, for appellant.
James W. McGlaughn and Michael D. McGlaughn of McGlaughn & McGlaughn, L.L.C., Gadsden, for appellee.
MOORE, Judge.
Hokes Bluff Welding and Fabrication ("the employer") appeals from a judgment entered by the Etowah Circuit Court awarding Christopher Neil Cox ("the employee") permanent-total-disability benefits under the Alabama Workers' Compensation Act ("the Act"), Ala.Code 1975, § 25-5-1 et seq., as a result of a lower-back injury that the trial court determined was caused by a November 9, 2004, occupational accident.

Procedural History
On January 20, 2005, the employee filed a complaint against the employer seeking workers' compensation benefits. In that complaint, the employee alleged that he had injured his lower back in a work-related accident on November 9, 2004. On February 22, 2005, the employer filed an answer generally denying that the employee had injured his back as alleged and asserting various affirmative defenses, including the applicable statute of limitations.
The employee filed an amended complaint on July 8, 2005. In the amended complaint, the employee asserted that he had also injured his lower back in a work-related accident on December 19, 2000, and that the employer was estopped from asserting the statute of limitations as a defense to his claim for disability benefits for that accident. The employer filed an answer admitting that the employee had injured his back in 2000 as alleged but affirmatively pleading the applicability of the statute of limitations.
On June 20, 2006, the trial court bifurcated the issues for trial purposes. The trial court then conducted a trial on August 31, 2006, relating solely to the issues of the employer's liability for the two alleged injuries and the employer's statute-of-limitations defense. On December 8, 2006, the trial court entered an order finding that the employee had sustained a work-related lower-back injury on December 19, 2000. The trial court concluded that the statute of limitations had expired on the employee's claim for disability benefits for that injury but that the statute of limitations did not affect his claim for medical benefits for that injury. The trial *594 court also found that the employee had sustained a new injury to his lower back on November 9, 2004, and that that injury arose out of and in the course of his employment with the employer. The employer filed a "motion to reconsider and/or to alter, amend or vacate the judgment" on January 8, 2007; that motion was denied on January 24, 2007.
On February 14, 2007, the employee filed a motion to compel the employer to pay temporary-total-disability benefits based on the December 8, 2006, order. The employer argued that the December 8, 2006, order was not a final judgment that would support an appeal and that it was withholding payment pending an appellate determination as to the merit of its defense to liability. On October 23, 2007, the trial court conducted a final hearing to determine the benefits payable by the employer to the employee for the November 9, 2004, injury. The trial court entered a judgment on November 12, 2007, awarding the employee permanent-total-disability benefits as a result of the November 9, 2004, injury. On December 21, 2007, the employer filed a notice of appeal from that judgment as well as from the December 8, 2006, order.[1]

Issues
The Act provides that an employee must file a claim within two years of the date of the accident causing the personal injury for which the employee seeks compensation. See § 25-5-80, Ala.Code 1975. An "accident," for purposes of the statute of limitations, is "an unexpected or unforeseen event, happening suddenly and violently, with or without human fault, and producing at the time injury to the physical structure of the body ...." § 25-5-1(7), Ala.Code 1975 (emphasis added). Hence, when a worker has sustained two work-related accidents, one within the statutory limitations period and the other outside the statutory limitations period, the applicability of the statute of limitations depends on which of the two accidents caused the worker's personal injury. See Ex parte Rhea, 807 So.2d 541 (Ala. 2001), on remand, Diamant Boart American Wheel Trueing Tool Co. v. Rhea, 807 So.2d 546 (Ala.Civ.App.2001); Poole v. Ellard Contracting Co., 527 So.2d 1327 (Ala. Civ.App.1988); Baggett v. Builders Transp., Inc., 457 So.2d 413 (Ala.Civ.App. 1984); and Morgan v. Rheem Mfg. Co., 395 So.2d 1030 (Ala.Civ.App.1981). In Fort James Operating Co. v. Crump, 947 So.2d 1053 (Ala.Civ.App.2005), this court recognized that in cases of multiple accidents, the effective date commencing the limitations period turns on whether the personal injury may be characterized as a recurrence, an aggravation, or a new injury. 947 So.2d at 1065. If, following the second accident, the worker experiences a recurrence of the prior injury, any claim for benefits based on that recurrence relates back to the date of the original accident; on the other hand, if the second accident aggravates the personal injury caused by the first accident, or the second accident results in a new injury, then the limitations period commences on the date of the second accident. Id.
"A court finds a recurrence when `the second [accident] does not contribute even slightly to the causation of the [injury].' 4 A. Larson, The Law of Workmen's Compensation, § 95.23 at *595 17-142 (1989). `[T]his group also includes the kind of case in which a worker has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion.' 4 A. Larson, § 95.23 at 17-152. A court finds an `aggravation of an injury' when the `second [injury] contributed independently to the final disability.' 4 A. Larson, § 95.22 at 17-141."
United States Fidelity & Guar. Co. v. Stepp, 642 So.2d 712, 715 (Ala.Civ.App. 1994). "The second injury is characterized as a `new injury' if it is the sole cause of the final disability." Ex parte Pike County Comm'n, 740 So.2d 1080, 1083 n. 2 (Ala.1999).
The parties are at issue over the trial court's finding in its final judgment that the 2004 accident resulted in a "new injury" and "[not] a reoccurrence or continuation of the December, 2000 incident."[2] The employer maintains that substantial evidence does not support that finding because the totality of the evidence indicates that the employee did not sustain a new injury due to the 2004 accident, and the employer asserts that the trial court impermissibly drew adverse inferences from the evidence without the benefit of expert medical testimony. The employee acknowledges that he did not present any expert medical testimony to support his claim, but he argues that the totality of the evidence supports the trial court's finding.

Standard of Review
In Ex parte Price, 555 So.2d 1060 (Ala.1989), our supreme court stated: "As the finder of facts, ... the trial court is authorized to draw any reasonable inference from the evidence, including conclusions of medical facts that are not within the peculiar knowledge of medical experts." Price, 555 So.2d at 1062. Accordingly,
"lay testimony may combine with medical testimony to supply th[e] requisite proof; and ... the medical testimony, when viewed in light of lay evidence, may amply support the medical causation element without the expert witness's employing any particular requisite language. It is in the overall substance and effect of the whole of the evidence, when viewed in the full context of all the lay and expert evidence, and not in the witness's use of any magical words or phrases, that the test finds its application."
555 So.2d at 1063.
Based on Price, a trial court may make a finding of medical causation without the benefit of any direct expert medical testimony, so long as the other evidence is sufficient to sustain its finding. The question whether a worker has satisfactorily proven the causal relationship between a work-related accident and a particular injury "in the absence of medical testimony, or by lay testimony coupled with medical evidence, must be determined on a case-by-case basis." Price, 555 So.2d at 1062. That question is one of fact to be decided in the first instance by the trial court. See Stewart v. ATEC Assocs., Inc., 652 So.2d 270, 274 (Ala.Civ.App.1994); and Statewide Painting Co. v. Sharron, 693 So.2d 518 (Ala.Civ.App.1997). On appellate *596 review, "`[w]e will not reverse the trial court's finding of fact if that finding is supported by substantial evidence  if that finding is supported by "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."'" Ex parte Southern Energy Homes, Inc., 873 So.2d 1116, 1121 (Ala.2003) (quoting Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala.1996), quoting in turn West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).
In this case, because the employee claimed a new injury from a specific strain occurring at an identifiable place and time, i.e., an "accidental injury," see Ex parte Trinity Indus., 680 So.2d at 266 n. 3, he bore the burden at trial of proving medical causation by a preponderance of the evidence. See § 25-5-81(c), Ala.Code 1975.[3] Therefore, on appellate review, we must determine whether the record contains evidence of such weight and quality that the trial court reasonably could have determined that a preponderance of that evidence proved that the 2004 accident caused the employee a new injury. See Ex parte McInish, [Ms. 1060600, Sept. 5, 2008] ___ So.3d ___, ___ (Ala.2008). In making that determination, we may not reweigh the evidence, id., but we must view the overall substance of the evidence, including not only the expert testimony, but also the lay and circumstantial evidence, in a light most favorable to the findings of the trial court. Ex parte Southern Energy Homes, 873 So.2d at 1122.

The Evidence
The pertinent evidence contained in the record establishes the following: While the employee was working as a welder and fitter for the employer on or about December 19, 2000, he injured his lower back lifting heavy objects at work. The employee notified his employer of the accident, but because the employee did not request medical attention, the employer did not fill out a first report of injury or notify the employer's workers' compensation insurance carrier of the injury.
The employee continued working and about 15 months later obtained his own unauthorized medical treatment for his 2000 back injury from Dr. Paul Muratta, a pain-management specialist. Between March 2002 and June 2004, the employee visited Dr. Muratta 22 times. On those visits, the employee complained of tenderness in his lumbar spine and lumbar facet joints and severe, sometimes-sharp, sometimes-dull, throbbing lower-back pain, with numbness and tingling extending from his lower back down his buttocks into his hips, legs, and both feet. The employee told Dr. Muratta numerous times that his pain interfered with his ability to work normally and limited his other physical activities. Dr. Muratta attempted to relieve the employee's symptoms with different oral and injected narcotic pain medications and pain-reduction procedures, without any lasting effect.
The employee underwent a magnetic resonance imaging ("MRI") scan on March 8, 2002, that revealed degenerative disk disease at the L1-L4 levels of the employee's lumbar spine and a lumbar CT scan on August 2, 2003, that showed spondylosis *597 and disk bulges at the L4-5 and L5-S1 areas of the employee's back, most prominently at L4-5. On May 7, 2004, the employee submitted to another MRI scan. The radiologist who performed that scan reported that he found "mild central spinal canal and bilateral recess stenosis at L4 secondary to disc bulging and early osteoprolific disease." Based on these studies and his clinical examinations, Dr. Muratta diagnosed the employee at various times with low-back pain and radiculopathy secondary to lumbar degenerative disk disease, disk bulging or disk herniation, lumbar facet arthropathy, osteoarthritis, myofascial pain syndrome, and sacroiliitis.
The employee testified that on August 9, 2004, the employer filed a first report of injury for his 2000 back injury at his request. The employee then gave a statement to the insurance adjuster assigned to handle his claim and was informed that due to the delay between the date of the accident and the date of the filing of the first report of injury, the adjuster would have to investigate the claim before deciding whether to accept it.
While awaiting the resolution of his claim, the employee saw Dr. Muratta on August 10, 2004, and October 15, 2004. On that last visit, Dr. Muratta recorded that the employee was tender throughout the lumbar spine and musculature; that the employee was complaining of stabbing mid- and low-back pain, which the employee rated as an 8 on a 10-point scale; that the pain extended downward into both legs; and that the employee was also experiencing numbness in both legs. Dr. Muratta diagnosed low-back pain with radiculopathy and myofascial pain syndrome. The employee stated that nothing relieved his pain, including his pain medication; that his pain increased with standing and walking; and that his pain interfered with his mood, physical activity, and concentration.
The employee was never given any written work restrictions by Dr. Muratta, and he performed his normal job as a welder and a fitter, although with apparent difficulty, at all times before November 9, 2004. The employee testified that before October 2004 he had occasionally missed work to see Dr. Muratta but that he had tried to schedule his visits during off-work hours. The employee missed work completely on October 1, 25, and 29, 2004, for medical reasons. The employee also left work early on October 6, 8, 11, and 15, 2004, for medical reasons.
The employee testified that, on November 9, 2004, he picked up a heavy object at work and that, while in the act of placing the object on a table, he heard a "pop" inside his back and felt a sharp pain "like an icepick just jabbed" in his lower back and that the pain shot upwards. The employee testified that he immediately realized his back pain had worsened; he stated that, at that time, he thought, "I got to see about this" because he was "dying in pain." No one witnessed the accident. The employer immediately filed a first report of injury based on the employee's version of the accident.
That same day, the employee visited Dr. Nathalla Elmore, an authorized physician, complaining of "the worst possible" sharp, stabbing pain in his lower back radiating down both legs causing numbness and tingling to his feet. On examination, Dr. Elmore found tenderness throughout the lumbar spine and pain reproduced with motion. In addition, Dr. Elmore noted that the employee was leaning over the examination table and exhibited difficulty walking. Dr. Elmore diagnosed a lumbar strain, prescribed medication, took the employee off work for the rest of the day, and ordered a lumbar MRI scan. The radiologist *598 who performed the MRI scan the next day reported the following findings:
"At least mild central spinal canal and bilateral lateral recess stenosis is redemonstrated at the L4-L5 level, secondary to mild disc bulging and facet joint arthropathy. Slightly milder findings are also noted at the L2-L3 level."
Upon comparing the November 10, 2004, MRI films to the May 7, 2004, MRI films, the radiologist stated: "The overall appearance of the lumbar spine is unchanged since the previous examination of May 2004." After receiving the MRI report, and finding the employee's back pain unimproved despite physical therapy, Dr. Elmore continued to excuse the employee from work and referred the employee to Dr. Terry Andrade, a neurosurgeon.
Dr. Andrade first examined the employee on November 16, 2004. The employee told Dr. Andrade that he had been having ongoing back pain for three years that had recently increased from an 8 to a 10 on a 10-point scale after November 9, 2004. Dr. Andrade testified that, as part of his examination of the employee, he had looked for signs that the employee had sustained an acute injury to his back and had found none. Dr. Andrade also testified that he had found no evidence of an acute injury on the November 10, 2004, MRI film.
As part of his treatment of the employee, Dr. Andrade compared the November 10, 2004, MRI films with the May 7, 2004, MRI films. Dr. Andrade testified that the two films were the same, with no changes to or difference in the physical structure of the employee's back, specifically that "[t]here was no increase in the size of his disk bulges, no instability of the spine, there's no facet joint synovial cyst that had popped out or anything." Dr. Andrade then ordered a lumbar myelogram, which the employee underwent on November 17, 2004. Regarding the results of that diagnostic test, Dr. Andrade testified:
"Q: [Counsel for the employer:] ... Was there anything new in the myelogram that wasn't showing up or wasn't present in the MRI test?
"A: No.
"Q: Did there seem to be any change in the physical structure of [the employee's] back according to the myelogram as compared to the May 2004 MRI?
"A: No.
"....
"Q: Based on your actual review of those tests, those films, did you make some determination as to whether or not there had been any change in those?
"A: The sensitivity of the MRI and the degree of what you can see on myelogram, postmyelogram CT, it looked like that the myelogram was slightly worse but not bad. Then the MRIs, the MRIs looked the same. The postmyelogram CT, the way I worded it probably isn't the best way to word it, but in comparison of the earlier studies and the myelogram, the degree of the abnormality looked to be slightly increased, but that doesn't mean that there was a change. It just means that from those prior studies to the new study, in the technique of the study, that it does look a little tiny  but it wasn't significant. But there were some slight increase in the amount of observable facet and disk bulging problems."
Dr. Andrade explained that the myelogram test is significantly more sensitive than an MRI scan and that the myelogram shows a "crisper" image than the MRI tests that had been performed in north Alabama. Dr. Andrade testified that the myelogram results looked slightly worse "primarily" because of that difference.
*599 Dr. Andrade testified that, in his opinion, the employee had degenerative disk disease and disk bulges. As to the issue in this case, Dr. Andrade testified:
"Q: [Counsel for the employer:] And what was your determination?
"A. Continuation of an old injury.
"Q: What was the basis for making that determination?
"A: His subjective complaints have increased minimally. First of all, his subjective complaints of pain far exceed his exam, his studies. Eight out of ten, ten out of ten pain, you're going to be in the hospital. You're not walking around going `I've got ten out of ten pain.' Unless you're Superman. Ten out of ten pain is you want to die right there on the spot. So his subjective complaints of pain have not significantly increased from his complaints that have been going on for at least three years from what he told me the first time I saw him. His physical exam really hadn't changed remarkably. His subjective complaints seem to be pretty consistent with what he had before, and his diagnostic studies really haven't changed that much. So there's nothing really significantly new going on from what was going on before as far as I can tell from the records.
"Q: And is your opinion in that regard based on the physical examination, his complaints and diagnostic studies, and, of course, your training, education, and experience as a neurosurgeon?
"A: Yes. I don't think there's much going on with him period.
"Q: And your opinion that his problems were a continuation of his old injury, is that an opinion based on a reasonable degree of medical certainty?
"A: Yes.
"Q: In those visits when you saw [the employee] ... was there any evidence to suggest a new acute injury had occurred to him on November 9th, 2004?
"A: There really isn't a whole lot of evidence he has an injury, period.
"Q: So was there any evidence of a new injury?
"A: New, old or otherwise, there wasn't anything significant."
On cross-examination, Dr. Andrade reviewed the first report of injury and testified that it accurately summarized the employee's version of the November 9, 2004, accident as the employee had related it him. When asked whether that accident could have aggravated the employee's prior back problem, Dr. Andrade testified that the employee had all the same symptoms as before and that "[t]here wasn't anything that was accelerated or exacerbated. We've established that." Dr. Andrade further testified that, although anything was possible, "[w]e haven't found anything that did happen [in the way of an acceleration or aggravation.]"
While receiving treatment from Dr. Andrade, the employee visited Dr. Martin Jones, a neurosurgeon, without authorization from the employer. On November 22, 2004, the employee informed Dr. Jones that he had been experiencing chronic back pain with occasional numbness and tingling in his legs, with no relief from pain management, but that his pain had worsened after November 9, 2004. On exam, Dr. Jones found mild tenderness in the lumbar spine, a mild deficit in the employee's lumbar range of motion, and a normal neurological exam. Dr. Jones noted that he reviewed the employee's "MRI and CT myelogram," which he found "unremarkable with just some minimal degenerative changes and very mild early stenosis." Dr. Jones also noted: "I do not see anything to operate on based on these plain films, his MRI or the myelogram." Dr. Jones recommended a diskogram, but *600 the employee, who had already been through that procedure in July 2003 with Dr. Muratta, declined. Dr. Jones therefore recommended continued pain management.
After another visit and normal examination on December 7, 2004, Dr. Andrade returned the employee to work without restrictions. At the trial, the employee testified that he could no longer work due to his increased pain. The employee requested surgery, but, like Dr. Jones, Dr. Andrade found no medical evidence to support a need for surgery. Dr. Andrade ordered nerve-conduction studies and electromyelogram studies, which were performed on December 14, 2004, and which produced normal results. Dr. Andrade last saw the employee on December 16, 2004. At that time, Dr. Andrade recommended a conditioning program and an evaluation for a back brace. Although Dr. Andrade scheduled a follow-up visit, the employee testified that he did not attend the visit because he had no faith in Dr. Andrade.
On February 8, 2005, the employee underwent a diskogram. The report from that diskogram is not in evidence. On March 17, 2005, the employee visited Dr. Muratta's partner, asserting continued complaints of low-back pain with occasional numbness extending down the right leg. The employee reported that the diskogram had indicated an annular tear at the L4-5 level. Following that visit, the employee visited Dr. Muratta's practice twice more while waiting for the employer to provide him with a panel of four physicians from which he could select a new treating physician. See § 25-5-77(a). On April 15, 2005, he reported that his physical activities had greatly diminished due to his continued back problems, and, on June 14, 2005, he reported that he had tried methadone without success.
The employee selected Dr. Matthew Berchuck from the panel of four provided by the employer and visited him on September 19, 2005. On that visit, the employee told Dr. Berchuck that after his 2000 back injury he had experienced pain at a level of 6 on a 10-point scale but that his back and leg symptoms had increased dramatically after November 9, 2004, to a 9.5 level, after which he had not returned to work. The employee told Dr. Berchuck of his diskogram. Dr. Berchuck asked the employee to obtain a copy of the study. At that point, Dr. Berchuck recommended either continued pain management or, depending on his review of the employee's previous diagnostic studies, a fusion of the L4-5 vertebrae with hopes of returning the employee to the pain level the employee had reported he had been experiencing "before his injury of November 9, 2004."
On October 4, 2005, after having reviewed the diskogram, the films from a February 2005 MRI scan, and the employee's previous studies, Dr. Berchuck concluded that surgery was not the best course of treatment. Dr. Berchuck concluded that the diskogram study found "some abnormality in the L4-5 disk morphology," which a CT scan characterized as an "internal disc rupture;" however, the diskogram did not show an annular tear, as the employee had earlier reported, or an epidural leak. Dr. Berchuck subsequently referred the employee to Dr. Ronald Moon for pain management.
On December 27, 2005, the employee returned to Dr. Berchuck with reports of no relief from Dr. Moon's treatment. Dr. Berchuck agreed to proceed with the fusion surgery, which was performed on January 6, 2006. The surgical report indicates that Dr. Berchuck completely resected the facet joint, which "was noted to be quite hypertrophic and the L4 and L5 nerve roots were defined and decompressed *601 out their foramen." Dr. Berchuck then incised the L4-5 disk and performed a complete diskectomy. The employee followed up with Dr. Moon, who at one point released him to return to work with restrictions. The employee tried to work for two days, but he could not perform the nonphysical aspects of the job.
On October 18, 2007, Dr. Berchuck wrote the following letter:
"I have treated [the employee] for problems related to a job related accident that occurred in November of 2004. He is currently followed by Dr. Doleys, who is treating him with a pain pump and other pain management techniques. [The employee] was referred for an FCE on 06/14/07 with Rehab Partners in Gadsden. I have reviewed the findings in the FCE and defer to the findings in that report. [The employee] reached Maximum Medical Improvement on 10/10/07. I assign him an impairment rating of 18% to the body as a whole. I have nothing further to offer [the employee] at this time. ..."
The employee and his wife testified at trial that, although the employee could work before the 2004 accident, he had become basically totally physically disabled since that time.

Analysis

The Circumstantial Evidence
In this case, the medical records and the employee's own testimony show that, from the time of his 2000 accident up to the date of the 2004 accident, the employee experienced severe and unrelenting back pain with occasional numbness and tingling extending down one or both lower extremities into his feet that required intensive and continuous medical intervention. The employee told Dr. Muratta repeatedly that his symptoms interfered with his ability to work normally, and it is undisputed that the employee left work early or missed work entirely on eight occasions during the month before his 2004 accident due to his ongoing back problems.
Following the 2004 accident, the employee did not suddenly develop new and different symptoms. The medical records preceding and following the 2004 accident show that immediately after the accident and ever since the employee has complained of pain in the same parts of his body as before the accident. The employee testified that his pain increased after the 2004 accident, but he described the same pain-distribution pattern as before the accident.
The foregoing circumstantial evidence tends to prove that the employee sustained neither a new injury nor an aggravation of the old injury, but a recurrent lower-back injury as described in Stepp"`a worker has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion.'" 642 So.2d at 715 (quoting 4 A. Larson, The Law of Workmen's Compensation, § 95.23 at 17-152 (1989)).

The Medical Evidence
Dr. Andrade, the only doctor who testified, opined that, to the extent the employee injured his back in 2000, his 2004 back problem was merely a "continuation" of that injury, attributing the employee's back problem entirely to his preexisting condition and discounting any possibility that the 2004 accident had aggravated the employee's prior low-back problem. Like Dr. Andrade, the radiologist who compared the November 2004 MRI film to the May 2004 MRI film, found no change to the physical structure of the employee's back. That medical evidence contradicts *602 the employee's claim that either he sustained a new injury to his lower back or his prior back condition had worsened due to his 2004 accident.
In its final judgment, the trial court concluded that "[t]he record is well documented that [the employee] has had a significant and detailed course of treatment on his back where Dr. Andrade failed to find any problems." Based solely on that finding, the trial court did not "find Dr. Andrade's [deposition] testimony ... either credible or compelling." The trial court's finding that Dr. Andrade "failed to find any problems" is not supported by substantial evidence but, rather, contradicts the undisputed evidence. Dr. Andrade testified on direct examination that after reviewing the MRI and myelogram films, he diagnosed the employee with disk bulges and degenerative disk disease. The record reveals that Dr. Jones and, at times, Dr. Muratta made the same or similar diagnoses. Dr. Andrade opined that he did not consider the employee to have a significant injury, but he did not testify that he found no lower-back problem at all. Moreover, even if the trial court had properly disregarded Dr. Andrade's testimony, the record still contains the radiologist's report finding no changes in the employee's lumbar spine following the November 2004 accident.
In Rich v. Warren Manufacturing, Inc., 634 So.2d 1015 (Ala.Civ.App.1994), this court considered the effect of radiological evidence on the issue of medical causation. Steve Rich, the claimant, tripped and fell while working for Warren Manufacturing, Inc., in 1991. After that fall, Rich complained of pain in his lower back that extended down his right leg. 634 So.2d at 1016. A neurosurgeon referred Rich for a myelogram and a CT scan, which prompted a surgery in which the surgeon found a small fragment of a herniated disk at L5-S1. The employer filed a motion for a summary judgment in which it presented evidence indicating that Rich had undergone two previous back surgeries in 1982 or 1983 and in 1988, respectively. 634 So.2d at 1017. After those surgeries, Rich continued to receive treatment for ongoing lower-back problems and had actually submitted to a lumbar myelogram and CT scan in June 1991, before the August 1991 accident, after which he had discussed further surgery with his treating physician. Id. The surgeon who performed the 1991 surgery testified in deposition that the results of the August 1991 and June 1991 diagnostic tests were "almost identical" and "very similar." Id. The surgeon also found Rich's clinical findings in August 1991 to be "essentially the same" as the findings had been in June 1991. Id. Accordingly, the surgeon testified that the surgery he performed in August 1991 was for a condition that probably existed in June 1991. Id. However, Rich testified in his deposition that, although he had ongoing symptoms before the 1991 work-related accident, he was able to fully perform his job duties and that, after the 1991 accident, the pain had increased so that he needed the third surgery. Id. The neurosurgeon who performed the third surgery testified in his deposition that the 1991 fall could have caused disk material or cartilage to move against a nerve and cause increased pain. Id. In addition, the orthopedic surgeon testified in his deposition
"that although the test results of June 1991 and August 1991 were very similar, it does not necessarily mean that the symptoms experienced by [Rich] were the same. He further testified that while these tests conducted in June 1991 and August 1991 are fairly sensitive, the tests are not always sensitive enough to detect a small disc fragment such as was removed from [Rich's] lower back during the August 1991 surgery. He also *603 testified that while the tests might not have shown the small disc fragment, a small disc fragment, such as the one removed, might cause exacerbated pain."
Id. Based on the combination of Rich's testimony and the doctors' testimony, this court concluded that there was a genuine issue of material fact as to whether Rich had, in fact, sustained a new injury despite the identical radiologic findings both before and after the accident. 634 So.2d at 1018.
In this case, unlike in Rich, the employee has presented no evidence undermining the accuracy of the radiological evidence. The employee also presented no evidence indicating that the diagnostic testing simply was not technologically proficient enough to detect the alleged new injury or aggravation the employee sustained in 2004. The employee introduced the surgical report detailing the condition of the employee's lumbar spine as observed by Dr. Berchuck in January 2006, but the employee did not present any evidence explaining whether the surgical findings conflicted with the diagnostic studies or whether the surgical findings proved that, in fact, he had sustained a new injury or aggravation in the 2004 accident. In Ex parte Price, the supreme court held that "the trial court is authorized to draw any reasonable inference from the evidence, including conclusions of medical facts that are not within the peculiar knowledge of medical experts." 555 So.2d at 1062. However, to find the diagnostic studies unreliable, and to find that Dr. Berchuck discovered during surgery a new injury or aggravation of the old injury related to the 2004 accident, the trial court would not be drawing reasonable inferences from the circumstantial evidence but would be deciding matters lying exclusively "within the peculiar knowledge of medical experts." Id.
Although the employee concedes that he did not present any medical testimony to support his claim, he argues that he did present medical evidence that the 2004 accident caused a new injury, namely the medical records of Dr. Berchuck. On September 19, 2005, when taking a history from the employee during his initial examination, Dr. Berchuck recorded the employee's statement that "[h]e was doing his regular job until a second work-related injury on November 9, 2004." Dr. Berchuck also stated in his records that if the employee underwent surgery, the goal would be to return the employee to his pain level "before his injury in 2004." Additionally, Dr. Berchuck stated in his last note that he had been treating the employee for problems "related to a job related accident that occurred in November of 2004."
Contrary to the employee's contention, those statements do not indicate that Dr. Berchuck investigated the issue and stated an expert opinion that the employee had actually sustained a new injury. The first two excerpts merely reflect the chronology of the employee's back problem as provided by the employee. The last excerpt suggests a causal relationship between the employee's injury and the 2004 accident; however, the note does not address the crucial issue of whether that accident caused a new injury, an aggravation, or a recurrence of the symptoms of the old injury.
The employee also notes that Dr. Berchuck found an "internal disc rupture" in the February 2005 diskogram at L4-5; however, the record shows that the employee had positive findings at L4-5 on diagnostic studies before the 2004 accident, and the employee has not presented any evidence indicating that the description of *604 the L4-5 abnormality as an "internal disc rupture" indicates a different condition suggesting a new injury or an aggravation. Again, in order to reach that conclusion, the trial court would have had to make an expert medical conclusion, which Price does not allow.
In Fort James Operating Co. v. Crump, supra, Earnestine Crump, the claimant, originally injured her lower back on March 25, 1998, while straining to lift a heavy roll of plastic. 947 So.2d at 1055. Crump recovered from the injury sustained in that accident sufficiently to return to work. However, on November 5, 1998, Crump again strained her lower back lifting a roll of plastic wrap at work. 947 So.2d at 1057. Following that accident, Crump experienced worsening back pain and submitted to an MRI scan that showed a large herniated disk at L4-5. 947 So.2d at 1058. Four doctors testified in the case. One doctor testified that Crump had merely strained a lumbar muscle in the March 1998 accident and that the herniated disk was a totally new injury resulting solely from the November 1998 accident. 947 So.2d at 1060. The other three basically opined that the March 1998 injury had caused an asymptomatic herniated disk at L4-5 that was herniated more acutely in the November 1998 accident so as to become symptomatic and disabling. 947 So.2d at 1066. Based on the evidence indicating that the November 1998 accident had caused a harmful anatomical change in the physical structure of Crump's body, this court concluded that the November 1998 accident had resulted in either a new injury or an aggravation of a preexisting condition, either of which constituted a separate cause of action for the purposes of the statute of limitations. 947 So.2d at 1066-67. Totally opposite of Crump, the medical evidence in this case proves that the 2004 accident did not cause any new damage to the physical structure of the employee's body. In other words, according to the medical evidence, the 2004 accident caused only a recurrence of the employee's prior injury and did not "`contribute even slightly to the causation'" of that injury. Stepp, 642 So.2d at 715 (quoting 4 Larson, § 95.23 at 17-142).

Conclusion
Based on our review of all of the lay, circumstantial, and medical evidence contained in the record, see Ex parte Southern Energy Homes, supra, we conclude that the trial court could not have reasonably determined that a preponderance of that evidence proved that the 2004 accident caused a new injury or an aggravation of an old injury. Because the trial court's findings of fact are not supported by substantial evidence, we conclude as a matter of law that the employee's claim for compensation is barred by the statute of limitations. For the foregoing reasons, we reverse the judgment of the trial court and render a judgment in favor of the employer on the employee's claim for compensation.[4]
REVERSED AND JUDGMENT RENDERED.
THOMAS, J., concurs.
THOMPSON, P.J., concurs specially, which BRYAN, J., joins.
PITTMAN, J., concurs in the result, without writing.
THOMPSON, Presiding Judge, concurring specially.
Based on our supreme court's opinion in Ex parte Southern Energy Homes, Inc., *605 873 So.2d 1116 (Ala.2003), I am constrained to agree with the main opinion that the employee's testimony and the medical evidence before the trial court did not supply the substantial evidence of medical causation necessary to support the trial court's judgment. For this reason, I concur.
BRYAN, J., concurs.
NOTES
[1] We have jurisdiction over the appeal from the December 8, 2006, order because it was an interlocutory order when entered, see USA Motor Express, Inc. v. Renner, 853 So.2d 1019 (Ala.Civ.App.2003), and became a final and appealable judgment when the final December 21, 2007, judgment was entered. Lanier v. Surrett, 772 So.2d 1187, 1189 (Ala.Civ.App. 2000) (citing Zimzores v. Veterans Admin., 778 F.2d 264, 266 (5th Cir.1985)).
[2] Neither party has appealed that portion of the judgment concluding that the employee is not entitled to any compensation based on the December 19, 2000, accident due to the expiration of the applicable statute of limitations but is entitled to medical benefits for that accident. That part of the judgment is therefore conclusively established as the law of the case. See J.K.L.B. Farms, LLC v. Phillips, 975 So.2d 1001 (Ala.Civ.App.2007).
[3] In his brief to this court, the employee argues that the employer bore the burden of proving that the 2004 accident did not cause the employee a new injury and that the 2004 accident caused a mere "continuation" of the employee's prior injury. However, the employee did not cite any legal authority for that proposition; hence, we do not consider that argument. See Rule 28(a)(10), Ala. R.App. P.
[4] Our judgment does not affect the employee's right to receive medical treatment on account of his December 19, 2000, injury. See n. 2, supra.